Whitaker, Judge,
delivered the opinion of the court:
This is a suit for the refund of Federal unemployment taxes previously paid for the tax years 1950 through 1954 pursuant to section 1600 of the Internal Kevenue Code of 1939.[1] The plaintiff’s claim rests solely on the ground that he was not an employer within the meaning of the statute. Defendant says that he was. This is the only question to be decided.
The relevant facts show that plaintiff, during the tax years in question, was a bandleader engaged in what is esoterically known as the “club date” or “pick-up” orchestra field. He operated his business under the name “Ben Cutler Music” and maintained an office with a small staff in New York. Plaintiff’s business consisted of furnishing music at country clubs, colleges, hotels, and private residences for dinners, dances, wedding receptions, debutante parties, and other similar social functions. The plaintiff secured engagements for his music by advertisement, through personal con *539 tact, and, in some instances, through wedding consultants and others, to whom he paid a commission of 15 percent. The record shows that he personally solicited 75 percent of his business during the years in question.
The contracts for the engagements were generally negotiated by the plaintiff over the telephone. He would discuss with the purchaser of the music the nature of the party, the number of musicians needed, the instruments they were to play, the musicians’ dress, the type of music to be played, and whether the music was to be continuous or noncontinuous. At this time the total price was agreed upon between the parties. In negotiating this price plaintiff took into consideration the minimum rates established by Local 802 of the American Federation of Musicians. Plaintiff also took into consideration the nature of the affair, the class of society from which the prospective purchaser came, and, after a discussion with him, the amount which the purchaser expected to pay. The price agreed upon usually contained an amount as profit for the plaintiff a9 well as payments for the musicians and expenses.
Once the plaintiff and the purchaser had entered into a contract, the plaintiff proceeded to secure the musicians to fulfill the engagement. The musicians hired, for the most part, did not have regular employment, but earned their income by being employed for single engagements such as plaintiff or other persons in the industry might offer them. These musicians were all members of Local 802 and their pay, except for minor instances, was governed by the rules of the Union. Under the Union rules, the plaintiff was primarily responsible for the payment of the musicians’ wages. As a general rule, the purchaser paid the plaintiff the contract price previously agreed upon, and the plaintiff paid the musicians their wages out of this sum.
During the years in question plaintiff used some 437 musicians to fulfill some 1,635 engagements. While 291 musicians never appeared at more than two engagements during any one year, a small number of musicians were used by plaintiff on numerous occasions. The record shows that for the years in question there were an average of 16 men who played 25 or more engagements and received 70 percent *540 of the wages paid by plaintiff; 10 men who played between 10 and 24 engagements and received 11 percent of the wages; and 127 men who played 9 or less engagements and received 19 percent of the wages.
Once the musicians were hired, plaintiff in many instances accompanied them to the site of their engagement and acted as their leader. On those occasions when plaintiff did not accompany the musicians, he appointed one of them as leader. In all engagements, he or the leader, whom he appointed, always obeyed the desires of the purchaser of the mufeic which were expressed at the time the contract was made or which might be expressed while the engagement was in progress. The record shows that on occasion the purchaser would ask the musicians to play particular tunes and to stroll among the guests. These requests or orders were always obeyed.
The written contracts between the purchaser and the plaintiff were for the most part executed on contract forms prescribed by the Union, know as “Form B”, “Form B-l” and “Form B-2.” These forms provided that the purchaser of the music would have complete control of the services which the musicians would render under the contracts, and would distribute to the several musicians the amounts shown on the reverse side, which was the Union scale. Although in practice the purchaser, except in rare instances, had nothing to do with the selection of the individual musicians, the contract, nevertheless, provided that the leader had the right to replace any “employee” who was unable to keep his engagement. In the case of steady engagements, Rider A or B were attached to the contract. Rider A provided that the purchaser would be liable for all taxes applicable to services performed under the contract, and, in the event the leader was held liable, the purchaser guaranteed to reimburse him. Rider B provided for a 7 percent increase in the contract price and payment by the leader of all employment taxes. This agreement guaranteed reimbursement of the purchaser if he should be held liable for the tax. The price list of Local 802 also contained the following provision with regard to single engagements:
*541 On every single engagement, in all classifications, the Leader shall receive, in addition to his Leader money, a sum equal to seven (7) per cent of the total contract price, if it is at scale.
In the event that the contract price is at least seven (7) percent above scale, the contract will be approved.
The gist of plaintiff’s argument is that the purchaser of the music, not the plaintiff, controlled the musicians’ services, and, therefore, the purchaser was the employer. Plaintiff relies principally on section 1607(i) of the Internal Revenue •Code of 1939, which defines an employee as follows:
Employee. — The term “employee” includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2-) any individual (except an officer of a corporation) who is not an employee under such common-law rules.
Plaintiff says that this language limits the court to the use of the “common law control” test to determine the relationship between the parties.
We do not agree. Although control or the right to control activities is generally indicative of the employer-employee relationship, Edwards v. United States, 144 C. Cls. 158, the final determination of such a relationship is determined only by a realistic consideration of all the factors involved. Bartels v. Birmingham, 332 U.S. 126; Beatty v. Halpin, 267 F. 2d 561; Metropolitan Roofing & Modernizing Co. v. United States, 125 F. Supp. 670; Jagolinzer v. United States, 150 F. Supp. 489.
In this case, it seems obvious that the plaintiff, and not the purchasers of the music, was the employer of the musicians. The purchaser was interested in the leader, not in the individual musicians, except in rare instances. The leader had. established a reputation of putting on good performances. Because of this he was employed not because of a certain man who played the violin or the trombone. What violinist or trombone player was to be employed was the leader’s responsibility. The purchaser was interested only in the overall effect, in the montage, not the individual pictures. Plaintiff selected and employed the musicians and *542 was responsible for the payment of their wages. It is true that occasionally a purchaser would request a particular musician, but in such instances it was still plaintiff who hired the musician. In all cases, the purchaser accepted the mw-sicians sent by plaintiff and exercised no right to refuse their services.
It was plaintiff, and not the purchasers who were in the business of providing music at social functions. The success of this business depended on plaintiff’s ability and reputation as a musician. He is the one who bears the loss and gains the profit. This was not true of the purchasers who were merely buying the plaintiff’s skilled services for a limited period. They had no pecuniary interest in the enterprise. Also, it is clear that the relationship between the plaintiff and the musicians was much more permanent than that between the purchasers and the musicians. In the latter instance, the relationship existed generally for one night, while in the former many of the musicians were used on other engagements performed by the plaintiff.
Plaintiff contends, however, that all these factors are irrelevant because the purchasers had the contract right to exercise control over the musicians. It is well settled, however, that the words of contracts alone cannot shift tax liability fixed by statute. Bartels v. Birmingham, supra; Lucas v. Earl, 281 U.S. 111. How the contract was actually performed, how the parties actually understood it and acted upon it, is a better guide to the true intent than the words, which are often used to conceal, not to convey, thought. There is no evidence that the purchasers of the music contributed, or had the power to contribute, musical skill or direction which would give them effective control over the musicians. The only control exercised by the purchasers concerned the type of music, its tempo, and the physical location of the musicians. This type of control pertains to the service to be rendered and does not give control over the method of rendering it. The method of rendering the music is a skilled art and cannot be controlled by an inexperienced layman. The fact that a house owner tells an independent house painter the color to paint his house does not make the *543 painter the owner’s employee. See Edwards v. United States, supra.
It seems clear in this case that the plaintiff is an independent contractor, and the musicians hired by him were his employees.
It results that plaintiff’s petition must be dismissed.
It is so ordered.
Barksdale, District Judge, sitting by designation; Laba-mobe, Judge; Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Richard H. Akers, makes the following findings of fact:
1. The plaintiff is an individual who resides in Connecticut but has his place of business in New York City. He was born in 1905 and was graduated from Yale University in 1926 where, during the period of his undergraduate studies, he was interested in and took part in various musical activities. Since 1927 he has been in the entertainment business as a professional singer, musical comedy star, night club entertainer, orchestra leader, instrumentalist, and to a small extent song writer. He is an accomplished musician as well as a singer. During the 1930’s he performed as a singing actor in various musical comedies such as “The Fireman’s Flame” and “The Eternal Road”.
2. In 1938, the plaintiff organized a “name band” called “Ben Cutler and his Orchestra”, of which he was the leader, to play at Rockefeller Center in New York City. He assembled, equipped, and maintained this organization, furnishing uniforms, special musical arrangements, manuscript sheet music, and holding such rehearsals as were required for a continuing musical unit with distinctive style. This band first consisted of eight men and eventually was expanded to fourteen. It first appeared at the Rainbow Grill and later at the Rainbow Room, both in the Rockefeller Center. The former had a capacity of about 250 people and the latter was. a nationally advertised night club with a capacity of about 400 people.
*544 The plaintiff played five or six months at the Rainbow Grill and then three months at the Rainbow Room. After being ont for three months, he obtained a series of return engagements at the same place for periods of six weeks to three months over some three years, including the first two periods mentioned. For each of these engagements he signed a Union form B contract with the management of Rockefeller Center for the appearance of the musicians, of which group he was to appear as the leader. When he secured a contract for each of these engagements, he in turn arranged with individual musicians of the number required under his contract with Rockefeller Center for their appearance during a given engagement. During the same period his band conducted radio performances and also performed on a tour of several months. The personnel of the band remained approximately 80 percent the same over the three-year period. Because of its relatively permanent nature and its distinctive style, this band was commonly referred to as a “name band”.
3. In 1940, the plaintiff gave up the musical enterprise just referred to and returned to musical comedy, in which work he continued until 1948. For six months he played the lead in the Broadway musical “One Touch of Venus”. He also appeared as a musical comedy star at a night club in the St. Moritz Hotel in New York City.
4. In 1946, the plaintiff entered what is commonly known as the “club date” or “pick-up” orchestra field. He remained in this business through the years in question — 1950 through ,1954 — to which years the remaining findings relate, except as otherwise stated, as well as subsequent thereto.
5. The services the plaintiff provided consisted of furnishing music for social functions, at country clubs, other private clubs, colleges, hotels, and private residences, including, at such places, dinners, dances, wedding receptions, debutante parties, outings or entertainments of business organizations, and other functions of a similar character. The number of musicians varied from one to fifteen and the plaintiff himself often appeared, usually as leader. These engagements were primarily for only one occasion or “single” engagement, although, as hereinafter appears, the plaintiff did arrange some longer or “steady” engagements. Under Union rules, *545 all engagements of one week or longer were considered steady engagements and those for less time as “single” engagements, and will be so referred to herein. The engagements were generally in the vicinity of New York City although on occasions were as far away as Delaware and Massachusetts.
6. In order to carry on his pick-up orchestra activities during the period 1950 through 1954, the plaintiff maintained an office in New York City where he never had more than two regular office employees. He had no regular staff of musicians under contract to appear at engagements booked by him. The only continuing contract he had with any musician during this period was a guaranty of a minimum amount per year to a musician known as Mickey Sheen, who was frequently requested by name by purchasers of music. Sheen’s actual compensation was based on each engagement at which he appeared, which compensation never fell below the guaranteed annual minimum. In addition, he had one musician, Paul Peters, who assisted him in contacting musicians at the Union hall or by telephone when he was seeking musicians to fill engagements and for that service the plaintiff paid Peters about $1,400 per year. The plaintiff’s office expense amounted to approximately $6,750 per year.
7. In carrying on his pick-up orchestra activities the plaintiff used the trade name “Ben Cutler Music”. As heretofore shown, he had been engaged in musical and entertainment activities since his graduation from Yale University in 1926. He was well known in musical and entertainment circles not only because of his musical and leadership ability but also for his reputation to furnish an orchestra of the type desired for social functions. He expended on the average during the years in question about $2,400 per year for advertising, promotion, and publicity. He hired a publicity agent to secure the mention of his name in syndicated newspaper columns. He advertised in publications likely to attract purchasers of music, such as country club magazines and dance programs. His advertisement in the Westchester Country Club News carried his picture and name as well as his trade name “Ben Cutler Music”. On occasions, he passed •out souvenirs with his name on them. At his engagements he used an electric sign which read “Ben Cutler Music”. *546 Much of his advertising in publications was in something in which the purchasers of music were interested, such as a program for a given occasion or a magazine put out hy an organization in which, on request, he felt he could not refuse to place his advertisement. Because of the importance of personal contacts in securing business, the plaintiff made it a point to move in circles and in places where he would come in contact with wealthy people and on occasions he entertained people of that type at the country club to which he belonged, or otherwise, for which he took deductions on his income tax return as business expense. These entertainment expenses were on the average $1,280 per year for the years in question.
8. The plaintiff secured engagements for his music in several ways. When he commenced business in 1946, he sent post cards to local country clubs and telephoned their managers. He asked personal friends who were club members to put him in touch with chairmen of entertainment committees. He told these chairmen that he was an instrumental musician, a singer, and a Yale graduate, and asked them to let him provide music at some of their parties. While some purchasers of music contacted the plaintiff directly and there was a certain amount of repeat business, he personally solicited 75 percent of his business during the years in question. Some engagements were obtained through wedding consultants and others to whom he paid a 15 percent commission. These commissions averaged about $900 per year for the years 1950 through 1954.
9. The contracts for engagements were generally negotiated by the plaintiff himself over the telephone. . He would discuss with the purchaser of music the nature of the affair or party, the number of musicians to appear, the instruments they were to play, the dress of the musicians, the tempo of the music and whether it was to be continuous or non-continuous, and the name of the person to be in charge off the affair for the purchaser. The total price was also agreed upon. Except in some instance where a purchaser would request a particular musician, the selection of the musicians would be made by the plaintiff on the basis of the type of music requested by the purchaser, the number of men, and the *547 instruments to be played. On occasions he would arrange for the appearance of entertainers in addition to the instrumental musicians who were to play in a pick-up orchestra. Since he did not specialize in booking vaudeville acts, he would arrange for such entertainers through a booking agency to whom he would pay a commission, as well as the compensation for the entertainers.
10. In negotiating with the purchaser of music for a contract, the plaintiff took into consideration the rates established by Local 802, American Federation of Musicians, for musicians of the type called for by the contract. The plaintiff and substantially all, if not all, musicians secured by him to fulfill these contracts belonged to that Union and the rates of that Union were observed by the plaintiff in paying the musicians for the performance. In addition to the minimum wage scale, the by-laws of the Union required other payment to be made under certain circumstances. One such requirement was that an additional amount had to be paid for transportation for engagements a certain distance from the center of New York City. The price list of the Union contained the following provisions with respect to the payments to a “leader” as hereinafter described:
Eule 1. “Eegulations for Establishing Leaders’ Fees on Single Engagements Unless Otherwise Provided For.”
A. An engagement played by one member shall charge in addition to the Union scale of the engagement 25 per cent additional as Leader (Personnel Manager) fee.
B. An engagement played by two members shall charge in addition to the Union scale of the engagement 50 per cent additional as Leader (Personnel Manager) fee.
C. An engagement played by three members shall charge in addition to the Union scale for the engagement 75 per cent additional as Leader (Personnel Manager) fee.
D. Where four or more men are employed the Leader shall charge and receive double the regular scale, i.e., 100 per cent additional as Leader (Personnel Manager) fee.
Eule 2. In the absence of the Leader (Personnel Manager), the member representing him for any part or all of the engagement shall receive one-half the extra charge made in conformity with Eule 1, unless otherwise provided.
*548 In addition to the wage scale of the musicians, the plaintiff also took into consideration in negotiating such a contract .the class of society from which the prospective purchaser •came and what, after a discussion with him, the prospective purchaser would expect to pay, that is, whether he was thinking in terms of a luxury or a minimum cost production. However, the business in which the plaintiff was engaged was highly competitive and the plaintiff had to take this into consideration in determining the amount he could charge. He included in such contract price a profit for himself which, in the case of country clubs, was approximately $2 per man over and above the wages and expense.
11. The person who performed services of the character herein referred to by the plaintiff of furnishing an orchestra ■or musical entertainment was commonly referred to in the trade or business as a “contractor” and the person in charge •of the orchestra for the contractor at the function as a “leader”. In 1,635 engagements herein involved, the plaintiff appeared as leader in 789 and, when he did not so appear, he designated one of the musicians to act as leader or subleader.
The price list of Local 802 contained the following provisions:
B. Engagements for employment as musicians shall be accepted by members only through Leaders (Personnel Managers). Musicians employed through such Leaders (Personnel Managers) shall be deemed employees of the principals and the Leaders (Persomiel Managers) shall be deemed the agents of the principals and of the employed musicians in effecting such employment. Such Leader (Personnel Manager) shall, however, be deemed to have guaranteed payment of the agreed compensation to such musicians and shall personally be liable therefor. The principal, of course, shall likewise remain responsible and shall be entitled to due notice of hearing and trial on the issues involved.
* * ¡R * #
C. The Leader (Personnel Manager) shall at all times be responsible for payment to members engaged who perform on his engagement, even though such members performing such engagement were engaged by others authorized by the Leader (Personnel Manager).
*549 12. After he entered into a contract with the purchaser of music, the plaintiff proceeded to secure the musicians to fulfill the requirements of the contract. In general, the musicians ■of the type here involved were what are sometimes referred -to as “free-lance” musicians. In most cases they did not have regular employment but were picked up by a contractor when an opportunity came to perform at a given engagement. As heretofore shown, in substantially all, if not all, cases they belonged to Local 802. In his discussions with the purchaser of music, the plaintiff would ascertain the number of musicians required and, in general, the type of music and instruments to be played. In some instances, actual selections to be played would be given by the purchaser. After the plaintiff entered into the contract, he or his assistant, referred to in finding 6, would contact the musicians by telephone or personally at the Union hall and arrange with them to fulfill the engagement for which he had entered into a contract. Their pay, except in minor instances where he might pay a given musician a small amount for some special or extra service, was governed by the rules and regulations of the Union. Approximately 50 percent of the individual musicians whom he secured were not known personally by him. However, a substantial number of them were men whom he secured regularly for these engagements and some of them were musicians whom the purchasers of music at times requested by name since they had heard them play when the plaintiff had filled other engagements or otherwise knew of them. In those instances where he did not know the musicians personally, the plaintiff would check on their ability to fulfill the requirements of the contract. In all instances, he would advise them of the place and nature of the engagement.
13. As herein shown, at engagements where he did not appear, the plaintiff would designate one man to act as leader for him. The plaintiff would give him full instructions as to the date, time, and place of the engagement, the names of the musicians who were to appear, the nature of the engagement, and such other instructions as were furnished to him by the purchaser of the music. If the purchaser had expressed the desire for a particular type of music or had *550 submitted a list of tunes he wanted played, the plaintiff would give this information to the leader. He would also tell him whether the music would be continuous or noncontinuous. The plaintiff instructed the leader to report to the purchaser or his representative at the engagement and check on the arrangements. He instructed the leader to be ready to accept instructions on the job from the purchaser or his representative and, in all respects, endeavor to carry out his wishes and give him what he wanted. Except in minor instances, where the purchaser or his representative might make a request of a particular musician, the musicians received their instructions from and followed the instructions of the leader.
14. The by-laws and regulations of Local 802 during the years 1950 through 1954 required in various forms the filing of contracts with the Union, including the following:
Section 1. It shall be a violation and detrimental to the welfare of this Local for a member to commit any one or more of the following acts, all of which are hereby prohibited, viz.:
* * * * *
(g) To fail to file properly executed contracts with the Secretary of the Local on official contract blanks furnished by the Local, as specified in Article X of the By-Laws;
*****
(r) To accept engagements from a nonmember, except in the capacity of Leader. However, no member shall accept engagements from any musician of this jurisdiction who is a nonmember of this Local, or act as agent or leader for the same;
* * * * *
(aa) To contract or receive a deposit for any single engagement without filing such contract and depositing same with the Secretary of this Local before starting such engagement;
* * * * *
(rr) To play engagement without previously filing with the Secretary of the Local a contract which, except as otherwise permitted in writing by the Executive Board, shall be drawn on official contract blanks furnished by the Local and shall be properly executed by the employer, the Leader and the Local.
*551 Article X referred to in the above provision read in part as follows:
G. A member once engaged cannot be disengaged unless the engagement does not take place.
H. A single engagement may be cancelled, if such engagement does not take place, or a single engagement may be postponed, provided such members receive: [Then follow certain requirements as to notice.]
* * * * *
J. Contracts for all engagements (single or steady) must be filed in writing by the Leader (Personnel Manager) with the Secretary.
15. Contract forms known as “Form B”, “Form B-l”, and “Form B-2” were prescribed during 1950 through 1954 by the American Federation of Musicians and Local 802 thereof in accordance with their respective constitutions and by-laws. These forms, in their different versions, included substantially the following language:
The employer shall at all times have complete control of the services which the employees will render under the specifications of this contract. On behalf of the em-?iloyer the Leader will distribute the amount received rom the employer to the employees, including himself, as indicated on the opposite side of this contract, or in place thereof on separate memorandum supplied to the employer at or before the commencement of the employment hereunder and take and turn over to the employer receipts therefor from each employee, including himself. The amount paid to the Leader includes the cost of transportation, which will be reported by the Leader to the employer. The employer hereby authorizes the Leader on his behalf to replace any employee who by illness, absence, or for any other reason does not perform any or all of the services provided for under this contract. The agreement of the employees to perform is subject to proven detention by sickness, accidents, or accidents to means of transportation, riots, strikes, epidemics, acts of God, or any other legitimate conditions beyond the control of the employees. The employer agrees that the Business Representative of the Musicians’ Local in whose jurisdiction the musicians, are playing, shall have access to the premises in which the musicians perform (except in private residences) for the purpose of conferring with the musicians. The musicians performing services under this contract must be members of the American *552 Federation of Musicians and nothing in this contract shall ever be so construed as to interfere with any obligation which they may owe to the American Federation of' Musicians, subject, however, to all applicable laws.
The purchaser of the music is set out therein as the “employer”. The form had places thereon for the signature of such employer in accepting the contract and for the acceptance by the orchestra leader. In instances herein involved', where that type of contract was used, the plaintiff accepted' the contract as orchestra leader. The form also had a space' near the beginning thereof for the name of the person under whose leadership the orchestra would be conducted during-the period of the engagement which, at least in the case of the-plaintiff’s steady engagements, was usually someone other than the plaintiff, as more particularly shown in finding 13.. For most of the plaintiff’s engagements during the period! herein involved, the foregoing contract forms were used.
The following tabulation shows the total payments to-musicians during the years in question and the payments for’ engagements where form B contracts were used:

16. As the result of a controversy which arose between Local 802. and the Internal Revenue Service with respect to liability for taxes of the type here involved, the Union adopted the following riders to be attached to form B contracts for steady engagements in order to guarantee that funds would be available in the hands of the leader to take care of these taxes:
Rider A to Form B CoNtract
It is agreed that the undersigned employer shall pay all taxes and contributions payable by employers under *553 any Federal or State law applicable to the services performed under this contract, and shall make such with-holdings from the payments under this contract as are-required by such law. Until such payments and with-holdings are turned over to the Federal or State authorities, they shall be deposited in a special trust account,, separate from the employer’s funds. Such deposits shall be made upon each pay day. In the event that at any time liability for any such payments or withholdings-shall be imposed upon the leader, the employer agrees-(a) to transfer any and all such deposits and tax accounts-to the name and credit of the leader, and (b) to indemnify the leader against such taxes and contributions,, and against interest and civil penalties -thereon and by reason of failure to make withholdings.
Eider B to Form B Contract
Notwithstanding any other provision contained in this contract, it is agreed that the leader shall make the with-holdings and pay the taxes and contributions payable by an employer with reference to the employment of the musicians other than himself. In the event that at, any time liability for any such payments or withhold-ings shall be imposed on the purchaser of the music, the leader agrees to transfer any and all tax accounts to the name and credit of the purchaser of the music. It is further agreed that the price stated upon the face of the contract is hereby increased by an amount equal to-7 % of such price as so stated, which sum shall be paid, to the leader as additional compensation.
The price list of Local 802 contained the following provision:
On every single engagement, in all classifications, the Leader shall receive, in addition to his Leader money,, a sum equal to seven (7) per cent of the total contract price, if it is at scale.
In the event that the contract price is at least seven (7) per cent above scale, the contract will be approved..
17. In addition to the contracts where the forms described in findings 15 and 16 were used, the plaintiff entered into-contracts where those forms were not used. One of these-other types was on a form entitled “Memorandum of Agreement”, of which the following was typical:
*554 Dated: Mar. 8, ’51
Orchestra op & Musicians Under Leadership op : Thomas Fischer
Name & Address op Place op Engagement : Manhasset Bay Yacht Club, Port Washington, Long Island, N.Y.
Date op Engagement : April 14,1951 August 11,1951
Hour op Employment : 9:00 to 1:00
Agreed Price : $150.00 (for each engagement)
AGREEMENT is subject to such by-laws, rules and regulations of the American Federation of Musicians and the Local in which the engagement is played as are not in conflict with any Federal or applicable State law.
Accepted by: [signature illegible] Accepted by orchestra leader: Ben Cutler
For: Manhasset Bay Yacht Club Membership Card No. 1213
Purchaser of Music
Address: Port Washington, L.I., New York (City, State) Ben Cutler Music 341 Madison Ave. New York 17, N.Y.
Phone: Murray Hill 9-18xx
In some cases the purchaser of music would be reluctant to sign a contract where one of the forms was used with a substantial amount of fine print and would request that the plaintiff write him a letter embodying the terms of the agreement which he could sign. The following is a typical contract of that type:
April 20,1954.
Larchmont Yacht Club,
Larchmont, N.Y.
Gentlemen:
This will confirm the engagement of Ben Cutler Music, five (5) pieces to play under the direction of Paul Peters from 9 P.M. to 1 A.M. at the Larchmont Yacht Club on the evening of May 15,1954 at the agreed price of $210.00 (Two Hundred Ten and 00/100 dollars).
In order that I may have a record that these arrangements are correct, will you please sign two copies of this letter in the space provided below.
*555 I am so happy to have this opportunity of serving the Larchmont Yacht Club again.
Very sincerely yours,
[sgd] Ben Cutler.
Ben Cutler.
BC :ahp
[sgd] Robert F. Carnet,
For the Larchmont Yacht Club.
In still other cases, in an emergency such as where he would*, receive a request for a musician on the day of a performance,, the contract with the purchaser would be oral. Except in the instance just mentioned, copies of all contracts were filed, with the Union and all contracts, both written and oral, were-approved by the Union.
18. Most of the engagements herein involved were single-rather than steady engagements. In all cases, as heretofore shown, the plaintiff either appeared as leader or designated, another musician to act as leader or subleader. Both the instructions given by the purchaser of music to the plaintiff' prior to the execution of the contract and to him or his designated leader during the performance of the engagement varied greatly in accordance with the type of engagement. In some instances the instructions, prior to the execution of' the contract, would amount to little, if anything, more than that the plaintiff would provide an orchestra with a given number of musicians and likewise, at the performance, the-instructions given to the leader were negligible. In still other cases the instructions, both prior to the execution of the contract and during the performance, would be in substantial detail. In between the two extremes of instructions, there would be many types of variations.
19. An example of the type of engagement where substantial instructions were given was a wedding reception*, during the period involved which was similar in many respects to other elaborate functions of that character. In that, instance the purchaser of the music, who was the father of the-bride, discussed the details of the music he had decided upon,, including a definite number of musicians who were to play specified instruments so as to achieve the character of music which he had in mind, and also indicated that he would furnish a list of the musical selections which he had decided *556 upon. He also indicated that he had designated Mr. George Bognon, maitre d’hotel, as the person from whom the plaintiff was to. receive further instructions at the reception. After the contract was executed, the purchaser furnished the list of selections which the plaintiff used. At the beginning ■of the reception, Mr. Bognon instructed the plaintiff where the musicians were to play at different times during the day, what particular selections were to be played at certain times, whether slow or fast music, when to stop playing, whether to stay at one place or to stroll among the tables and ask for requested music, and other instructions of a similar nature. In all respects the plaintiff and his musicians followed the instructions received from the purchaser and his designated • representative.
At some wedding receptions, an entertainment consultant would give similar instructions to the plaintiff or his designated leader, which instructions were followed. A substantial number of the plaintiff’s engagements were at wedding receptions.
At other functions the plaintiff would be instructed where the orchestra was to be located and at times would be requested by someone in charge to move about among the guests ■to play certain music, stop at a certain time for refreshments, ;and otherwise follow the wishes of the purchaser.
20. During the period 1950 through 1954 the plaintiff •entered into contracts with four different purchasers of music for steady engagements. One of these purchasers was the Westchester Country Club, a country club of some 1,500 members with some 350 rooms for use by the members over the week ends, where the plaintiff furnished musicians for dances ■and otherwise on Saturday evenings and on Sunday afternoons and evenings from October to June, and nightly for a -three-weeks’ period at the end of summer. The number of musicians specified in the contracts varied from four to six and in all cases George Kiener was designated as the leader. On arrangement with the plaintiff, those musicians were paid by the club and their wages were not reflected in the plaintiff’s ■payroll since the club was willing to assume that responsibility. The club also paid the Federal taxes of the type here *557 involved on those wages. The plaintiff instructed the club .as to the wages to be paid each musician. On occasions, at these steady engagements at the club, the plaintiff would be ■called upon to arrange for an additional musician and in those instances the plaintiff would pay the musician. As a result of these engagements and otherwise, the plaintiff secured from 32 to 73 single engagements annually at the Westchester Country Club for private parties.
21. During 1951, and 1953 and 1954, the plaintiff arranged for musicians to play at steady engagements at the Forest Hills Inn. Specific leaders were designated in each of the several contracts for these engagements. These musicians were paid by the plaintiff in 1951 but in 1953 and 1954, under a similar arrangement as with the Westchester Club, they were paid by the Forest Hills Inn, and the Federal Unemployment tax was also paid by the Forest Hills Inn on those wages for these years. Because of the plaintiff’s inability to supply a particular musician in 1952, the Forest Hills Inn •did not arrange for musicians through the plaintiff for that .year. In three engagements, the contracts called for only •one musician, a pianist, for six nights per week for various indefinite periods; in four engagements the contracts called for four musicians, and in one engagement, the contract called for eight musicians. In one instance, where the Forest Hills Inn was dissatisfied with the pianist furnished, the plaintiff had him replaced with another pianist.
22. The plaintiff also arranged for one musician to appear •on a steady engagement of one week at the Mayfair Farms. This musician was paid by the Mayfair Farms. The plaintiff arranged another steady engagement for one week for a group of musicians at the Brighton Beach Baths. These musicians were paid by the plaintiff.
23. In all of these steady engagements, the instructions •given by the purchasers of music to the plaintiff and the musicians were similar to those described herein for single engagements. Form B contracts were used for these steady engagements. On the contracts with the Westchester Country Club, on one contract with the Forest Hills Inn, and on the contract with the Mayfair Farms, no riders of the char *558 acter described in finding 16 were used but on the other contracts with Forest Hills Inn, rider A was used, and on. the contract with Brighton Beach Baths, rider B was used-Neither rider A nor rider B was used by the plaintiff in any contract for single engagements.
24. As heretofore shown, the plaintiff had no regular staff of musicians under contract to perform at his engagements, but instead arranged with musicians for their appearance-after he had entered into a contract with a purchaser of music. During the period involved, he arranged for 1,685-engagements and used approximately 437 musicians to fulfill’ them. While there were a small number of musicians whom he used on many of his engagements and the bulk of whose-work was on the plaintiff’s engagements, 291 musicians never-appeared for the plaintiff more than twice during any one-year. For each of the years in question, there were on the-average 16 men who played 25 or more engagements for the plaintiff and, as a group, received 70 percent of the wages; paid by him; 10 men who played between 10 and 24 engagements and, as a group, received 11 percent of the wages paid by him, and 127 men who played 9 or less engagements and,, as a group, received 19 percent of the wages paid by him. The following tabulation gives additional detail as to the-frequency of the musicians fulfilling the plaintiff’s engagements and the amount of compensation received:

As shown in the provisions from the Union rules set out in finding 11, the plaintiff, as leader or contractor, was personally liable for the compensation of the musicians whom he secured for these engagements. In all instances, except *559 .as set out in the findings with respect to steady engagements, the plaintiff paid the musicians who performed at these engagements twice each month, the amounts so paid being the amounts on which the taxes here in controversy were paid by the plaintiff. On the single engagements, the plaintiff made no report to the purchaser of the music of the amount paid to the musicians. As shown in finding 15, form B contracts were used for most of the plaintiff’s engagements.
25. The type of music usually played by the plaintiff for his engagements was commonly referred to as “society music”, that is, a type of dance music with a rhythmic lift to which society people had become accustomed. Its general style involved a preponderance of show tunes from musical comedies. It was not a style of music distinctive of the groups of musicians assembled by the plaintiff but was of the type played by other pick-up orchestras in the New York area for society people. Many of the musicians in that area could play that music and they usually played it from memory. Except in an unusual case in a special situation no rehearsals were required in the engagements arranged by the plaintiff. The plaintiff had a library of sheet music which consisted of albums of popular tunes of the character played at the engagements arranged by him. Since the musicians engaged by him could usually play those tunes from memory, use was required to be made thereof only when some unf amiliar song or tune might be requested or where, in anticipation of such a song or tune, the plaintiff would take sheet music from his library with him. The plaintiff has written three or four songs for special occasions, two of which were played and recorded by his orchestra during the years in question. The label on the recordings stated that the songs were written by Ben Cutler and sung by him and his orchestra. Some of the well-known band leaders who assembled society orchestras in that area and who were competitors of the plaintiff were Meyer Davis and Lester Lanin. Where special costumes or uniforms were required under the contract with the purchaser ■of music, they were arranged for by the plaintiff without cost to the musicians.
*560 26.The plaintiff’s net income from his pick-up orchestra business, including compensation for his own personal appearance and performance as a musician, was derived as. follows:

27. As required by the Internal Eevenue Service, the plaintiff filed annual excise tax returns under the Federal Unemployment Act on employers of eight or more individuals and paid the tax shown due thereon. The plaintiff also filed Social Security tax returns for the musicians herein engaged by him and paid the tax shown due thereon for the period here involved.
28. The State of New York, through its Division of Placement and Unemployment Insurance, Department of Labor, on February 7,1951, ruled that the plaintiff was not an employer of musicians so as to render him liable for the payment of contributions to the New York State Unemployment Insurance Fund. That ruling was based upon instances where the form B contract was used by the plaintiff. Thereafter the Internal Revenue Service assessed and the plaintiff paid an additional amount of $1,180.05 for the year 1950 upon the refunding by New York State of the payment previously made to it by the plaintiff, such refund resulting from the determination that the plaintiff was not the employer of the musicians. The New York Workmen’s Compensation Board likewise did not consider the plaintiff an employer of musicians under the New York Disability Benefits Law during the years in question.
29. During the years involved, the plaintiff paid Federal Unemployment tax, penalties, and interest as follows:

*561

In October 1955 tbe plaintiff received a refund of $81.79 in Federal Unemployment tax for 1951. Claims for refund were timely filed for the recovery of the Federal Unemployment tax involved in this proceeding.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and the petition is therefore dismissed.

 Sec. 1600. Rate of Tax.
“Every employer (as defined In section 1607(a)) shall pay for the calendar year 1039 and for each calendar year thereafter an excise tax, with respect to having Individuals In his employ, equal to 3 per centum of the total wages (as defined In section 1607(b)f) paid by him during the calendar year with respect to employment (as defined In section 1607(c)) after December 31, 1938.’’