**Ben CUTLER**

v.

**UNITED STATES.**

No. 463–55.

United States Court of Claims.

Jan. 20, 1960.

Samuel Brodsky, New York City, for plaintiff. Alfred Miller and Alan Latman, New York City, on the briefs.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and M. Carr Ferguson, Washington, D. C., on the brief.

WHITAKER, Judge.

This is a suit for the refund of Federal unemployment taxes previously paid for the tax years 1950 through 1954 pursuant to section 1600 of the Internal Revenue Code of 1939.[1] The plaintiff's claim

---

1. Sec. 1600. Rate of Tax.

"Every employer (as defined in section 1607(a)) shall pay for the calendar year 1939 and for each calendar year thereafter an excise tax, with respect to having individuals in his employ, equal to 3 per centum of the total wages (as defined in section 1607(b)) paid by him during the calendar year with respect to employment (as defined in section 1607(c)) after December 31, 1938." 26 U.S.C.A. § 1600.

rests solely on the ground that he was not an employer within the meaning of the statute. Defendant says that he was. This is the only question to be decided.

The relevant facts show that plaintiff, during the tax years in question, was a bandleader engaged in what is esoterically known as the "club date" or "pick-up" orchestra field. He operated his business under the name "Ben Cutler Music" and maintained an office with a small staff in New York. Plaintiff's business consisted of furnishing music at country clubs, colleges, hotels, and private residences for dinners, dances, wedding receptions, debutante parties, and other similar social functions. The plaintiff secured engagements for his music by advertisement, through personal contact, and, in some instances, through wedding consultants and others, to whom he paid a commission of 15 percent. The record shows that he personally solicited 75 percent of his business during the years in question.

The contracts for the engagements were generally negotiated by the plaintiff over the telephone. He would discuss with the purchaser of the music the nature of the party, the number of musicians needed, the instruments they were to play, the musicians' dress, the type of music to be played, and whether the music was to be continuous or non-continuous. At this time the total price was agreed upon between the parties. In negotiating this price plaintiff took into consideration the minimum rates established by Local 802 of the American Federation of Musicians. Plaintiff also took into consideration the nature of the affair, the class of society from which the prospective purchaser came, and, after a discussion with him, the amount which the purchaser expected to pay. The price agreed upon usually contained an amount as profit for the plaintiff as well as payments for the musicians and expenses.

Once the plaintiff and the purchaser had entered into a contract, the plaintiff proceeded to secure the musicians to fulfill the engagement. The musicians hired, for the most part, did not have regular employment, but earned their income by being employed for single engagements such as plaintiff or other persons in the industry might offer them. These musicians were all members of Local 802 and their pay, except for minor instances, was governed by the rules of the Union. Under the Union rules, the plaintiff was primarily responsible for the payment of the musicians' wages. As a general rule, the purchaser paid the plaintiff the contract price previously agreed upon, and the plaintiff paid the musicians their wages out of this sum.

During the years in question plaintiff used some 437 musicians to fulfill some 1,635 engagements. While 291 musicians never appeared at more than two engagements during any one year, a small number of musicians were used by plaintiff on numerous occasions. The record shows that for the years in question there were an average of 16 men who played 25 or more engagements and received 70 percent of the wages paid by plaintiff; 10 men who played between 10 and 24 engagements and received 11 percent of the wages; and 127 men who played 9 or less engagements and received 19 percent of the wages.

Once the musicians were hired, plaintiff in many instances accompanied them to the site of their engagement and acted as their leader. On those occasions when plaintiff did not accompany the musicians, he appointed one of them as leader. In all engagements, he or the leader, whom he appointed, always obeyed the desires of the purchaser of the music which were expressed at the time the contract was made or which might be expressed while the engagement was in progress. The record shows that on occasion the purchaser would ask the musicians to play particular tunes and to stroll among the guests. These requests or orders were always obeyed.

The written contracts between the purchaser and the plaintiff were for the most part executed on contract forms prescribed by the Union, known as "Form B", "Form B–1" and "Form B–2." These forms provided that the purchaser of the music would have complete control of the services which the musicians would render under the contracts, and would distribute to the several musicians the amounts shown on the reverse side, which was the Union scale. Although in practice the purchaser, except in rare instances, had nothing to do with the selection of the individual musicians, the contract, nevertheless, provided that the leader had the right to replace any "employee" who was unable to keep his engagement. In the case of steady engagements, Rider A or B were attached to the contract. Rider A provided that the purchaser would be liable for all taxes applicable to services performed under the contract, and, in the event the leader was held liable, the purchaser guaranteed to reimburse him. Rider B provided for a 7 percent increase in the contract price and payment by the leader of all employment taxes. This agreement guaranteed reimbursement of the purchaser if he should be held liable for the tax. The price list of Local 802 also contained the following provision with regard to single engagements:

"On every single engagement, in all classifications, the Leader shall receive, in addition to his Leader money, a sum equal to seven (7) percent of the total contract price, if it is at scale.

"In the event that the contract price is at least seven (7) percent above scale, the contract will be approved."

The gist of plaintiff's argument is that the purchaser of the music, not the plaintiff, controlled the musicians' services, and, therefore, the purchaser was the employer. Plaintiff relies principally on section 1607(i) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 1607(i), which defines an employee as follows:

"*Employee.* The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

Plaintiff says that this language limits the court to the use of the "common law control" test to determine the relationship between the parties.

■ We do not agree. Although control or the right to control activities is generally indicative of the employer-employee relationship, Edwards v. United States, Ct.Cl., 168 F.Supp. 955, the final determination of such a relationship is determined only by a realistic consideration of all the factors involved. Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947; Beatty v. Halpin, 8 Cir., 267 F.2d 561; Metropolitan Roofing & Modernizing Co. v. United States, D.C., 125 F.Supp. 670; Jagolinzer v. United States, D.C., 150 F.Supp. 489.

In this case, it seems obvious that the plaintiff, and not the purchasers of the music, was the employer of the musicians. The purchaser was interested in the leader, not in the individual musicians, except in rare instances. The leader had established a reputation of putting on good performances. Because of this he was employed not because of a certain man who played the violin or the trombone. What violinist or trombone player was to be employed was the leader's responsibility. The purchaser was interested only in the overall effect, in the montage, not the individual pictures. Plaintiff selected and employed the musicians and was responsible for the payment of their wages. It is true that occasionally a purchaser would request a particular musician, but in such instances it was still plaintiff who hired the musician. In all cases, the purchaser accepted the musicians sent by plaintiff

and exercised no right to refuse their services.

It was plaintiff, and not the purchasers who were in the business of providing music at social functions. The success of this business depended on plaintiff's ability and reputation as a musician. He is the one who bears the loss and gains the profit. This was not true of the purchasers who were merely buying the plaintiff's skilled services for a limited period. They had no pecuniary interest in the enterprise. Also, it is clear that the relationship between the plaintiff and the musicians was much more permanent than that between the purchasers and the musicians. In the latter instance, the relationship existed generally for one night, while in the former many of the musicians were used on other engagements performed by the plaintiff.

Plaintiff contends, however, that all these factors are irrelevant because the purchasers had the contract right to exercise control over the musicians. It is well settled, however, that the words of contracts alone cannot shift tax liability fixed by statute. Bartels v. Birmingham, supra; Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. How the contract was actually performed, how the parties actually understood it and acted upon it, is a better guide to the true intent than the words, which are often used to conceal, not to convey, thought. There is no evidence that the purchasers of the music contributed, or had the power to contribute, musical skill or direction which would give them effective control over the musicians. The only control exercised by the purchasers concerned the type of music, its tempo, and the physical location of the musicians. This type of control pertains to the service to be rendered and does not give control over the method of rendering it. The method of rendering the music is a skilled art and cannot be controlled by an inexperienced layman. The fact that a house owner tells an independent house painter the color to paint his house does not make the painter the owner's em-

ployee. See Edwards v. United States, supra.

It seems clear in this case that the plaintiff is an independent contractor, and the musicians hired by him were his employees.

It results that plaintiff's petition must be dismissed.

It is so ordered.

BARKSDALE, District Judge, sitting by designation, JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.