Joseph CARROLL, Charles Peterson and Charles Turecamo, as Treasurer, Orchestra Leaders of Greater New York, Plaintiffs,

v.

ASSOCIATED MUSICIANS OF GREATER NEW YORK and Al Manuti, as President, Max L. Arons, as Secretary, and Hi Jaffe as Treasurer of Local 802, Associated Musicians of Greater New York, Defendants.

Joseph CARROLL, Charles Peterson and Charles Turecamo, as Treasurer, Orchestra Leaders of Greater New York, Plaintiffs,

v.

AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, Herman D. Kenin, as President of said Federation, Stanley Ballard, as Secretary of said Federation, and George V. Clancy, as Treasurer of said Federation, Associated Musicians of Greater New York, Local 802, and Al Manuti, as President of Local 802, Max L. Arons, as Secretary of Local 802, and Hi Jaffe, as Treasurer of Local 802, Defendants.

United States District Court
S. D. New York.
June 25, 1962.

See also 183 F.Supp. 636.

Godfrey P. Schmidt, New York City, for plaintiffs.

McGoldrick, Dannett, Horowitz & Golub, New York City, for defendants. Emanuel Dannett, Herbert D. Schwartzman, New York City, of counsel.

Ashe & Rifkin, New York City, for defendant Local 802. David I. Ashe, New York City, of counsel.

LEVET, District Judge.

Two civil actions for permanent injunctions are involved herein. Two other actions involving alleged violations of the anti-trust laws will be tried subsequently. The first action here, 60 Civil 1169, is an action to enjoin defendants from collecting from plaintiffs payments for the "Local 802 Single Engagement Welfare Plan," and the second, 60 Civil 4025, is an action to enjoin defendants from the collection of certain payments, to wit, a 1½% Local Tax and a 10% Traveling Surcharge, on the ground that all these exactions or impositions are allegedly forbidden by Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 186, as amended. Jurisdiction is alleged to arise under Section 302(e) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 186(e), and Title I of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. § 401 et seq.

In addition, in both actions plaintiffs seek to permanently enjoin defendants from reprisals or interferences with plaintiffs' business based on the fact that these actions and proceedings before the National Labor Relations Board have been instituted; plaintiffs also seek reasonable counsel fees.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

### I. THE PARTIES

1. Plaintiffs Joseph Carroll and Charles Peterson, at all times relevant herein, were and are orchestra leaders engaged in the so-called "single engagement" field (Carroll, 258; Peterson, 347, 349–352) and at the commencement of these actions were members of defendants American Federation of Musicians of the United States and Canada ("Federation") and Associated Musicians of Greater New York, Local 802 ("Local 802"). Neither Carroll nor Peterson is presently a member of defendant unions. (Peterson, 347–348; Carroll, 259).

2. Although plaintiff Orchestra Leaders of Greater New York ("OLGNY") is alleged to be an informal unincorporated

association comprising at least 50 members of a class allegedly represented by plaintiffs Carroll and Peterson, I find that there is a lack of evidence establishing that OLGNY is an association representing orchestra leaders, that it is presently in existence, that it has any members other than Carroll and Peterson, that it has in any way been damaged or aggrieved by any conduct of defendant unions or that it has any interest in these actions.

3. The plaintiffs purport to bring these actions "for themselves and for all of the members (so numerous as to make it impracticable to bring them all before the court) of Local 802 who are similarly situated. * * *" (See Complaint, 60 Civil 1169, par. 20; Complaint, 60 Civil 4025, par. 18).

I find that there is a lack of credible evidence that such class exists, and even if found to exist, that its members are "so numerous as to make it impracticable to bring them all before the court," or that the plaintiffs here fairly insure adequate representation of such class.

4. Defendant Local 802 is a labor union affiliated with the defendant Federation and with the AFL-CIO. Local 802 represents, among others, members who are leaders and sidemen [a] in the single engagement field. (Pl. Ex. 56, p. 110) Under Federation By-Laws, the territorial jurisdiction of defendant Local 802 consists of the five boroughs of New York City and Nassau and Suffolk Counties (Pl. Ex. 12, Section 6, p. 5; Cutler, 80–81; Arons, 453).

5. Defendants Al Manuti, Max L. Arons and Hi Jaffe are President, Secretary and Treasurer respectively of defendant Local 802.

6. Membership in a local affiliated with Federation implies membership in the Federation (Pl. Ex. 29, Sections 10 and 11, p. 34; Arons, 430).

7. Defendant Federation is a labor union affiliated with the AFL-CIO and it is comprised of 683 local unions, including defendant Local 802, located throughout the United States and Canada. (Ballard, 665, 667).

8. Defendants Herman D. Kenin, Stanley Ballard and George V. Clancy are President, Secretary and Treasurer respectively of the defendant Federation.

## II. THE SINGLE ENGAGEMENT INDUSTRY

9. A single engagement is defined in the By-Laws of defendant Local 802 (Pl. Ex. 29, Art. X, p. 63) and is a musical performance generally for one night but always for less than one week, including, but not limited to, such types of functions as weddings, commencements, debutante parties, fashion shows, sports events, college or high-school dances or other social events. (Cutler, 69, 242–243; Arons, 438, 457; Pl. Ex. 53, p. 39).

10. In the single engagement field, defendant Local 802, as a matter of policy, does not bargain collectively with member orchestra leaders. (Pl. Ex. 53, pp. 45, 68; Pl. Ex. 56, p. 110; see also Jaffe, 581–582).

11. A substantial number of Local 802 members serve as leaders each year. Of these members who serve as leaders, the large majority also act as sidemen on other occasions during the same year. Local 802 provides an "Exchange Floor" to aid members in securing single engagements. Members of Local 802 who are engaged by purchasers of music to act as leaders use the facilities of the "Floor" to select sidemen, and member sidemen likewise utilize these facilities to secure jobs with leaders. Frequently, members of Local 802 will exchange engagements so that a member engaged as a leader for one engagement becomes the sideman for the same musician whom he engaged as a sideman for the prior engagement. (Pl. Ex. 58; Deft. Ex. K; Arons, 463, 465–466; Sontag, 805–808, 817–818).

12. Plaintiffs Carroll and Peterson fulfill engagements outside of the State

---

[a]. The term "sidemen" refers to musicians who perform in a band or orchestra but does not include the leader or conductor of said band or orchestra.

of New York in which they usually operate and in which their principal offices are located. (Pl. Ex. 19, 21, 40, 41; Cutler, 154–155, 185; Carroll, 265–268; Peterson, 349–353, 383–387, 397–399).

13. Travel by orchestras in the single engagement field composed of members of defendant unions is contemplated by defendant unions and regulated by them in various ways. Thus, among others, Section 2 of Article 17 of the By-Laws of the Federation (Pl. Ex. 11, p. 114) provides:

> "If the Local Union in whose jurisdiction an engagement is to be played has a Local law requiring its members to file a written contract with the Local prior to each engagement, the traveling member or the traveling leader must so file such contract with such Local Union."

Section 13 of Article 15 (Pl. Ex. 11, p. 104) provides:

> "An orchestra playing miscellaneous out-of-town engagements [i. e., single engagements involving travel] in the jurisdiction of a Local which maintains a higher price than their own Local, must charge the price of the Local in whose jurisdiction they are playing, plus 10% of the price of the Local wherein playing."

Section 14 of Article 16 (Pl. Ex. 11, p. 109) provides:

> "For all traveling engagements the employer is required to at all times make payment for services in money of the country from which the engagement emanates, unless an amount in excess of the stipulated salary sufficient to cover the rate of exchange is paid."

Similarly, Rule 4 of defendant Local 802's Price List (Pl. Ex. 7, p. 23) in pertinent part provides:

> "Rule 4. For all single engagements beyond the limits of Greater New York (except engagements on Long Island covered below) or the jurisdiction of Jersey City Local, No. 526, in addition to railroad fare,

board and lodging, the following extra charges shall be made:

> "If within 25 miles, per man . . $3.00
> "If within 50 miles, per man . . 5.00
> "If within 75 miles, per man . . 7.00
> "For each additional 25 miles or less, extra, per man . . . . . . . . 2.00"

In short, defendants' own publications and practices, such as their 10% Traveling Surcharge, their rules and regulations pertaining to traveling members, their mileage charges, their regulations pertaining to steamship performances, etc., demonstrate that defendant unions represent members (both leaders and sidemen) in the single engagement field whose engagements require a constant continuous stream of trade and commerce between the States of the United States. (Pl. Exs. 7, 11, Arts. 15, 16, 26, 27; Deft. Exs. AE, AL, AQ, AR, AR1).

14. Defendant unions require their members to use a form of contract known as the "Form B" contract, which contract designates the purchaser of music as the "employer" and the musicians, including the leader, as "employees." (Pl. Ex. 13; Ballard, 695–696, 698; Cutler, 136; Arons, 471) The Form B contract or, at least, the details of such contract must be filed with Local 802 by member orchestra leaders performing within the jurisdiction of Local 802 and such contracts are not deemed effective unless approved by Local 802. (Pl. Ex. 53, p. 55; Pl. Ex. 56, pp. 127–128; Arons, 455–456) Any member failing to use said Form B contract is subject to penalty by the Federation. (Pl. Ex. 11, Art. 13, § 33; Ballard, 697–699).

15. Plaintiffs Carroll and Peterson have used the Form B contract prescribed by defendant unions. (Deft. Exs. T, U; stipulations of counsel, 653–659).

16. The purchaser of music is not in fact the employer of the sidemen and of the leader and, consequently, the purchaser is sometimes unwilling to assume the responsibility of an employer. (Cutler, 170ff; Ballard, 722–724) Accordingly, the Form B contract as prescribed

by defendant unions has in the past been subject to exception by rider which exonerates the purchaser who signs it from certain responsibilities as an employer, such as the withholding of taxes and the making of customary employer contributions, such as social security. (Pl. Exs. 25 p. 7, 79, 93 pp. 12–13).

17. Plaintiffs Carroll and Peterson devote their full time to their profession as leaders and never serve as sideman and their relationship with their clients, who are normally engaged in other businesses or professions than said plaintiffs, is transient in nature.

18. In the course of their business, said plaintiffs, among other things, customarily do the following:

(a) Organize their own bands (Cutler, 72; Carroll, 260; Peterson, 359–360);

(b) Maintain their own offices where they employ steady and/or part-time employees (Cutler, 77–78; Peterson, 347, 360);

(c) Acquire business as a result of their own contacts, reputations, and personal solicitations (Cutler, 78–79; Carroll, 261–262; Peterson, 360);

(d) Engage in and pay for advertising (Cutler, 80–85, 87, 127–128, 261–262; Peterson, 360) and prominently display their names wherever their engagements are played, thus indicating that the orchestra is the Joseph Carroll Orchestra or the Charles Peterson Orchestra (Cutler, 116, 260, 347);

(e) Negotiate and sign engagement contracts with purchasers of music (Cutler, 91; Carroll, 260–261; Peterson, 359);

(f) Generally lead or conduct their own orchestras (Cutler, 77; Carroll, 260; Peterson, 359) and appoint subleaders to lead when they do not do so themselves (Cutler, 73; Carroll, 276; Peterson, 393);

(g) Decide on how their orchestras are to render their pieces; choose the tempo and decide on the dynamics, tone coloring, volume and the type of syncopation, if any, which is to characterize the performances of their orchestras (Cutler, 117–118; Carroll, 269–270; Peterson, 359–360);

(h) Decide, subject to union minimum requirements on the number (Cutler, 91, 95; Carroll, 264) and qualifications of sidemen who are to play in their orchestras (Cutler, 72, 91; Carroll, 262; Peterson, 359–360);

(i) Call for rehearsals and train their orchestras if they deem it necessary (Cutler, 129, 130; Carroll, 275; Peterson, 359–360); and

(j) Correct sidemen during a performance if necessary and otherwise discipline or discharge those who are unsatisfactory (Cutler, 121–122; Carroll, 273).

19. There is no evidence that purchasers of music contributed, or had the ability to contribute, musical skill or direction which would give them genuine or effective control over the individual methods employed by Carroll and Peterson and their orchestras in rendering performances.

20. Carroll and Peterson pay all expenses connected with the performances of their orchestras, including, among other things, subject to union minimums, sidemen's salaries (Cutler, 91–92; Carroll, 262–263); uniforms, if any, worn by their sidemen during engagements (Cutler, 11; Carroll, 270); mileage fees, cartage fees, food and lodging for their orchestras (Cutler, 111–115; Carroll, 265, 277); sheet music racks; and special arrangements of music to be played by their orchestras (Cutler, 119, 129–130; Carroll, 270).

21. Said plaintiffs, in connection with the employment of their sidemen, withhold and pay over to the appropriate governmental agencies federal and state withholding taxes and social security. In addition, they pay workmen's compensation and disability insurance on behalf of their sidemen. These items are paid because, under the particular governmental regulations involved, orchestra leaders are regarded as "employers" (Cutler, 125–126, 138; Carroll, 274).

468

## III. TRAVELING SURCHARGE

22. Art. 15 of the By-Laws of the Federation provides a definition of "Miscellaneous Out-of-Town Engagements," which corresponds in duration with Local 802's definition of "single engagements" (see Finding of Fact No. 9). (Compare Pl. Ex. 11, Art. 15, §§ 1 and 2, with Pl. Ex. 29, Art. X, p. 63)

23. Federation members who perform a "miscellaneous out-of-town engagement" are paid, but do not actually receive, in addition to their wages, an amount equal to 10% of the minimum wage established by the local in whose jurisdiction the engagement takes place. This additional amount is known as the "Traveling Surcharge." (Pl. Ex. 11, Art. 15; Art. 16, § 1A; Art. 17 § 1)

24. The leader does not actually turn over the additional 10% to his sidemen because Federation By-Laws provide that the local in whose jurisdiction such engagement is performed must collect the Traveling Surcharge from the leader, who is a member of the Federation, and transmit such collection to the Federation. (Pl. Ex. 11, Art. 15, § 7) If the local fails to collect the surcharge from the leader, who is a member of the Federation, such leader must transmit the surcharge directly to the Federation. (Pl. Ex. 11, Art. 15, § 8)

25. The provisions of Federation's By-Laws relating to the Traveling Surcharge are applicable without regard to whether the member of the Federation who pays, collects or transmits the Traveling Surcharge may for some purposes be deemed to be an employer or an employee. (Pl. Ex. 11, Art. 15, §§ 1–3)

26. Defendants never obtain from any of the member sidemen involved any writing authorizing deduction of any part of the 10% Traveling Surcharge from their wages. (Pl. Ex. 53, pp. 67–68; Cutler, 153, 208; Arons, 443, 515, 529; statements of counsel, 760–762)

27. Defendant Federation retains 8/10ths of the Traveling Surcharge. The remaining 2/10ths is distributed as follows:

3/10ths is returned to the leader who initially transmitted it for the purpose of his undertaking the distribution and return of this amount to the individual members of the Federation, i. e., the sidemen, who played the particular engagement; and

4/10ths is returned to the local in whose jurisdiction the engagement was played. (Pl. Ex. 11, Art. 15, § 7; see also Deft. Exs. V, p. 345; AF; AG)

28. Members of the Federation, including member orchestra leaders, are subject to disciplinary action by the Federation for violation of the provisions of the By-Laws, including the provisions concerning the Traveling Surcharge. (Pl. Ex. 11, Art. 7, § 6; Art. 15, § 15; see also Jaffe, 650)

## IV. LOCAL 802 TAX

29. Defendant Local 802 imposes a "Local Tax," as defined or authorized in its By-Laws (pp. 65–66) and in Article 16, Section 26, of the By-Laws of the Federation, as well as in certain standing resolutions having the force and effect of By-Laws of Local 802. (Pl. Exs. 12, pp. 64–66; 29, pp. 65–66; Arons, 440–441, 446)

The Membership Resolutions contained in said By-Laws of Local 802 provide that the Local Tax is to be "payable and collected from all members * * * on all engagemens based on the scale price therefor" (Pl. Exs. 12, p. 65; 29, p. 65) and the orchestra leader as a member of Local 802 is responsible for collecting and transmitting the Local Tax (Pl. Ex. 12, p. 66; Arons, 442–443, 446, 512–514; Jaffe, 622–624).

30. Defendants never used, or obtained from the member sidemen involved, any writing authorizing deduction of Local Taxes from the wages of the sidemen. (Cutler, 153, 208; Arons, 443, 514–515, 529; stipulation of counsel, 760, 762)

31. The Local 802 tax is imposed solely on members of Local 802 and no person not a member of Local 802 is under any obligation to pay, collect, or transmit the tax to Local 802. The member-

ship obligation which requires members of the Local 802 to pay, collect or transmit said Local Tax is unrelated to a member's status as an employer or an employee. (Pl. Ex. 12, pp. 65–67)

32. Members of Local 802 are subject to disciplinary action for violation of the provisions of the By-Laws of Local 802, including the provisions relating to the 1½% Local 802 tax (Pl. Ex. 12, Art. IV, § 1(kk) p. 41).

## V. SINGLE ENGAGEMENT WELFARE PLAN

33. Pursuant to a standing resolution (Deft. Ex. 0, p. 10; Pl. Ex. 7, p. 4) Local 802's Executive Board on December 24, 1959 adopted a resolution establishing a single engagement welfare plan. Under the plan, the leader is required to include in the wage of each member of Local 802 $1.00 per engagement and this amount is to be included in the total price paid by the purchaser of musical services. The leader is responsible for the collection and remittance of the welfare surcharge of $1.00 per man per engagement to Local 802 (Pl. Ex. 16, pp. 6–7).

34. Orchestra leaders were informed of the details of the Welfare Plan at a meeting called by officers of defendant Local 802 on January 12, 1960 (Pl. Exs. 43; 53, pp. 15–24; 56, pp. 106–110; Cutler, 142–148, 278–281; Peterson, 360–381; Jaffe, 564–574). Admittedly no bargaining with orchestra leaders regarding the proposed Welfare Plan ever took place (Pl. Ex. 53, p. 45; Pl. Ex. 56, p. 110; statement of defendants' counsel, 581–582).

35. There is no obligation on the part of any person to pay, collect, or transmit the welfare charge to Local 802 if he is not a member of Local 802 (Pl. Ex. 16, pp. 6–7)

36. Notwithstanding that defendant unions discipline members for violation of their By-Laws (see Findings of Fact Nos. 28 and 32), there is no evidence that plaintiffs Carroll and Peterson, who are not presently members of defendant unions, are obligated or compelled, presently or in the future, to collect, transmit, or pay the Local Tax, Traveling Surcharge or Welfare Fund payments.

There is no evidence that any reprisals or economic sanctions have been imposed on plaintiffs Carroll and Peterson in their status as non-members. Nor is there any evidence that such reprisals or economic sanctions are threatened as a result of the institution of these actions.

Furthermore, there is a lack of credible evidence that expulsion was visited upon said plaintiffs as a result of their failure to make the aforesaid payments.

## DISCUSSION

### I.

#### A. THE CLASS ACTION

Rule 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. in pertinent part provides:

> "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all, may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is
>
> \* \* \* \* \* \*
>
> "(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

Rule 23(a) (3) provides for the spurious class action. See generally 3 Moore's Federal Practice, pp. 3442–3455. The rule requires that the character of the right sought to be enforced for or against the class be "several," that there be a "common question of law or fact" affecting the several rights, and that "common relief is sought." Mutation Mink Breeders Association v. Lou Nierenberg Corp., D.C.S.D.N.Y.1959, 23 F.R.D. 155. As Judge Bryan stated in the Mutation Mink case:

> "The 'spurious class suit' is merely a device for permissive joinder.

California Apparel Creators v. Wieder of California, supra [2 Cir., 162 F.2d 893, 174 A.L.R. 481]; 3 Moore, Federal Practice, 3442. It does not 'grant authority to adjudicate finally rights as to nonappearing parties or to confer any additional substantive rights upon the plaintiffs suing'. California Apparel Creators v. Wieder of California, supra, 162 F.2d at page 897; Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319. It is an invitation to the members of the affected class to join in the action. If they do not so join they cannot be bound by the result. 3 Moore, Federal Practice, 3443; Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84; Nagler v. Admiral Corp., supra."

In effect, it is but a congeries of separate suits. See also P. W. Husserl, Inc. v. Newman, D.C.S.D.N.Y.1960, 25 F.R.D. 264; Kaeppler v. James H. Matthews & Company, D.C.E.D.Pa.1960, 180 F. Supp. 691, 695.

█ Plaintiffs have failed to prove an essential element required for class actions under Rule 23 of the Federal Rules of Civil Procedure. It appears that plaintiffs attempt to define the class as one separate and distinct from the total membership of defendant Local 802. The plaintiffs allege that the class is composed of Local 802 orchestra leaders who, like plaintiffs, (a) never act as sidemen and devote all or substantially all of their time to their profession as orchestra leaders, (b) for their engagements employ sidemen who are members of defendant unions, and (c) deal with their clients as employers or independent contractors.[1]

There is no evidence that this class exists and, even if it does, that it has any members other than plaintiffs Carroll and Peterson and their witness, Ben Cutler. In 3 Moore's Federal Practice § 23.05 (2d Ed. 1948) it is stated:

"The *raison d'etre* of the class suit doctrine is necessity, which in turn depends upon the question of number. The question of what constitutes impracticability—when is a class so numerous as to make it impracticable to bring them all before the court—therefore remains.

"A reading of the cases convinces one that whether a number is so large that it would be impracticable to join all the parties is dependent not upon any arbitrary limit, but rather upon the circumstances surrounding the case; and there must be a positive showing of such circumstances. [citations omitted]"

The plaintiffs Carroll and Peterson are dissenting former members of defendant unions who object to certain union impositions. However, there are many members who do not appear to object and who, consequently, cannot be considered as being members of the same class as plaintiffs. Hansberry v. Lee,

---

1. The complaint in 60 Civil 1169 alleges:
"20. Plaintiffs bring this action for themselves and for all of the members (so numerous as to make it impracticable to bring them all before the court) of Local 802 who are similarly situated; and there are common questions of law and fact affecting their common rights; and a common relief is sought herein; and the object of the action is the adjudication of claims which do or may affect the specific property of plaintiffs and said class; and this class action is authorized by Rule 23 of the Federal Rules of Civil Procedure."
Paragraph 18 of the complaint in 60 Civil 4025 is similar to paragraph 20 quoted above and, in addition, the following is alleged:
"19. Plaintiffs and the class they represent, are: (a) employers who regularly employ sidemen or employee musicians who are members of the International Organization of Local 802 and of other locals affiliated with the International Organization; and (b) independent contractors who are largely engaged in the single engagement field; i. e., they are hired *ad hoc* by clients to furnish musical services for weddings, banquets, dances and other occasions which are not steady engagements. * * *"

1940, 311 U.S. 32, 61 S.Ct. 115, 85 L. Ed. 22.[2]

Although the issue is not raised by plaintiffs, it is, of course, true that the entire membership of defendant unions may constitute a class on whose behalf a class action may be instituted to vindicate common rights. But, as the court observed with regard to a true class action in Giordano v. Radio Corporation of America, 3 Cir.1950, 183 F.2d 558, 560, 561:

"Here the affidavits upon which the court acted make it perfectly clear that the membership of Local 103 is sharply divided on the very question involved in this case, the expulsion of plaintiff and his associates. * * * With a class thus sharply divided in opinion it would be absurd to say that the leader of one faction in the internecine struggle could adequately represent the whole membership. * * *

"In a true class suit the plaintiffs stand in judgment for the class and a judgment for or against the plaintiffs benefits or binds each member of the class personally under the principles of res judicata. The members of the class must, therefore be capable of definite identification as being either in or out of it. Such identification would not be possible in a case, such as this, of fluid factional groups in a labor union.

"The suit must, therefore, be regarded as brought by the plaintiff either solely to redress his own personal grievances against the defendants or possibly to redress the grievances of all the sixteen individuals whose expulsion has been voted."

The court found that if the latter view was taken this was "a spurious class suit, rather than a true one * * *. [I]t could hardly be held that they [plaintiffs] constitute a class 'so numerous as to make it impracticable to bring them all before the court.' * * * [T]he suit, if it may be entertained at all, must be regarded as brought by the plaintiff for his own benefit solely." Similarly, in Gray v. Reuther, D.C.E.D.Mich. 1951, 99 F.Supp. 992, aff'd 201 F.2d 54, plaintiff brought a class action seeking his own reinstatement as an officer of a union local and damages. The court dismissed the complaint and, among other things, stated:

"Moreover, plaintiff was ousted from office after an election in which approximately two thousand union members voted. Whether or not the election was valid, it shows that a substantial body of the membership of the Local is opposed to the plaintiff's position. The strength of the faction antagonistic to the plaintiff is immaterial; its existence indicates that the identity of interest that would qualify plaintiff to represent the members of Local 12 is lacking. Giordano v. Radio Corporation of America, 3 Cir., 183 F.2d 558."

The presence of the association, OLGNY, as a plaintiff does not cor-

**2.** In a recent decision, Associated Orchestra Leaders v. Philadelphia Musical Soc., D.C.E.D.Pa.1962, 203 F.Supp. 755, a complaint substantially the same as the one filed herein, was dismissed upon motion before trial insofar as it purported to allege a class action on the ground that "the inadequacy of representation is apparent." (p. 757) Cf. 3 Moore's Federal Practice § 23.07 [1], p. 3426; Nagler v. Admiral Corporation, 2 Cir. 1957, 248 F.2d 319. Professor Moore, supra, questions whether adequate representation is an important consideration in spurious class actions since, unlike true class actions, a judgment binds only those parties joined in the action. Nevertheless, it would appear unreasonable to allow even a spurious class claim to stand when, after trial, it appeared that the interest of the plaintiffs asserting such claim was clearly adverse to the class. In the present case, however the other basic requirements of Rule 23 of the Federal Rules of Civil Procedure have not been met and it is therefore unnecessary to rest my decision as to this issue solely on the ground of inadequate representation.

rect the defect in plaintiff's case with respect to the class action since there is no evidence to establish either the association's bona fide existence or its standing to sue herein. OLGNY is alleged to be composed of orchestra leaders who are members of defendant unions, but an unincorporated association has no standing to assert the rights of its members. Farmers Co-op. Oil Co. v. Socony-Vacuum Oil Co., 8 Cir.1942, 133 F.2d 101. Furthermore, the class is not confined to those persons belonging to the association; the association is supposedly one faction of the class. The complaint must be dismissed as to plaintiff OLGNY. See Associated Orchestra Leaders v. Philadelphia Musical Soc., D.C.E.D.Pa.1962, 203 F.Supp. 755.

The claims here cannot lie as a proper class suit. This disposition, however, does not preclude treating this suit as one brought by plaintiffs Carroll and Peterson in their individual capacities. Weeks v. Bareco Oil Co., 7 Cir.1941, 125 F.2d 84; see also Barbot v. Frackman, D.C.S.D.N.Y.1961, 191 F.Supp. 171; Giordano v. Radio Corporation of America, 3 Cir.1950, 183 F.2d 558.

## B. STANDING TO SUE OF PLAINTIFFS CARROLL AND PETERSON

Section 186(e) grants the district court jurisdiction to restrain violations of that section as follows:

> "The district courts of the United States * * * shall have jurisdiction, for cause shown * * * to restrain violations of this section."

Defendants argue that plaintiffs are objecting to certain payments which are imposed as membership obligations only on members and consequently, since plaintiffs Carroll and Peterson are no longer members of defendant unions, they have no standing here.

The section above quoted does not require a complaining party to be a member of the defendant union; it merely requires "cause shown." Plaintiffs contend that the allegedly unlawful imposi-

tions constitute an unreasonable interference with their respective businesses. If such unreasonable interference is proved, plaintiffs are entitled to relief.

■ Plaintiffs argue that when defendants commit acts without just cause or excuse and such acts interfere with the businesses of plaintiffs, defendants have been held to inflict irreparable harm and injunctions have issued to restrain such acts. See Paramount Pictures v. Leader Press, 10 Cir.1939, 106 F.2d 229; Bausch & Lomb Optical Co. v. Wahlgren, D.C.N.D.Ill.1932, 1 F.Supp. 799, aff'd, 7 Cir.1934, 68 F.2d 660, cert. denied, 292 U.S. 639, 54 S.Ct. 774, 78 L.Ed. 1491; Interborough Rapid Transit Co. v. Lavin, 1928, 247 N.Y. 65, 159 N.E. 863, 63 A.L.R. 188; Illinois Cent. R. Co. v. International Brotherhood, D.C.W.D.La.1950, 90 F.Supp. 640. The court here does not take issue with the general proposition contained in the cases cited to the effect that the right to carry on a lawful business is a valuable right which a court of equity will protect against unreasonable interference. However, speculation and surmise will not take the place of credible evidence and the burden is upon plaintiffs to establish an unreasonable interference with their businesses.

■ It appears that since the institution of these actions plaintiffs Carroll and Peterson have been expelled from union membership. Credible evidence is lacking to establish the reasons for such expulsion. In any case, they do not seek reinstatement to union membership. To hold that these plaintiffs have no standing because of their expulsion from membership would mean that this court was giving defendant unions authority at will to confer or withdraw jurisdiction from this court by the union's exercise of its power to expel individuals from membership—this was clearly not the intention of the legislature.

The plaintiffs Carroll and Peterson, therefore, are entitled to an opportunity pursuant to Section 186 to establish whether they are entitled to the aid of

this court in restraining the defendant from interfering with their respective business by acts allegedly unlawful under Section 186.

## II.

Defendants contend that this court lacks jurisdiction over the causes of action herein on the ground that the rendering of a musical performance is a "local affair." [3]

At the outset it should be noted that this issue was raised by defendants in connection with plaintiffs' motion for preliminary injunction and rejected by the Court of Appeals for the Second Circuit on two separate occasions.

■ ■ It is, of course, general doctrine that upon an interlocutory appeal from an order granting an injunction the appellate court will not go any further into the merits of the case than is necessary to decide the appeal. Ross-Whitney Corp. v. Smith Kline & French Lab., 9 Cir.1953, 207 F.2d 190; Ex parte National Enameling & Stamping Co., 1906, 201 U.S. 156, 26 S.Ct. 404, 50 L.Ed. 707; Caterpillar Tractor Co. v. International Harvester Co., 3 Cir.1941, 120 F.2d 82, 86, 139 A.L.R. 1; Drittel v. Friedman, 2 Cir.1946, 154 F.2d 653; Missouri-Kansas-Texas R. R. v. Randolph, 8 Cir.1950, 182 F.2d 996, 999. "This [appellate] court's function in reviewing the grant or denial of a preliminary injunction is a limited one. A motion for such relief is directed to the sound discretion of the district judge whose decision will not be reversed unless an abuse of discretion is apparent. American Visuals Corp. v. Holland, 2 Cir., 1955, 219 F.2d 223." Joshua Meier Company v. Albany Novelty Mfg. Co., 2 Cir.1956, 236 F.2d 144, 146. It is also a general rule that the decision of either a trial or appellate court in granting or denying a temporary injunction does not estop the parties or the court as to the merits of the case. Hunter v. Atchison, T. & S. F. Ry. Co., 7 Cir.1951, 188 F.2d 294, cert. denied, Hunter v. Shepherd, 1951, 342 U.S. 819, 72 S.Ct. 36, 96 L.Ed. 619; nor are the parties or the court estopped as to the issue of jurisdiction. See Lansden v. Hart, 7 Cir.1950, 180 F.2d 679, cert. denied, 1950, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 606.

■ However, in my view, decisions reached in regard to motions for preliminary injunction in this case are persuasive because the evidence adduced at trial regarding the business of plaintiffs Carroll and Peterson supports the legal conclusions as to jurisdiction reached heretofore in preliminary proceedings and upon interlocutory appeal.

1. Judge Dimock in Carroll v. Associated Musicians of Greater New York, D.C.S.D.N.Y.1960, 183 F.Supp. 636, granted plaintiffs' motion to restrain defendants from enforcing the Welfare Fund regulation despite the fact that he accepted defendants' contention that "welfare plan is to apply to single engagements played in New York State only." Judge Dimock stated:

"I therefore shall treat the 'industry' which must affect commerce for section 302 to apply as the 'single engagement' field in New York City and Suffolk and Nassau Counties, New York." (183 F.Supp. at 639)

Judge Dimock found that jurisdiction existed. He wrote:

"Plaintiffs make the point, without contradiction by Local 802, that if they fail to comply with the 'Regulations' they will be subject to intra-union reprisals, including boycott activities, which would prevent them from fulfilling engagements 'in many

---

3. Insofar as plaintiffs attempt to seek relief on the ground of defendants' alleged failure to bargain alone, it should be noted that failure to bargain is a matter within the primary jurisdiction of the National Labor Relations Board. Amazon Cotton Mill Co. v. Textile Workers Union, 4 Cir. 1948, 167 F.2d 183; California Ass'n v. Building and Const. Tr. Council, 9 Cir. 1949, 178 F.2d 175; Amalgamated Ass'n, etc. v. Dixie Motor Coach Corp., 8 Cir. 1948, 170 F.2d 902; Haspel v. Bonnaz, Singer & Hand Embroiderers, etc., D.C. S.D.N.Y.1953, 112 F.Supp. 944, aff'd, 2 Cir. 1954, 216 F.2d 192.

hotels and other places; and their sidemen or employees would not be permitted to work for them'. If these engagements were outside the state the dispute would then have a tendency to disrupt the flow of the services of the musicians across state lines. * * * [R]eprisals are likely and * * * even if they are directed only at local engagements, such for example as a boycott against all objecting leaders in their New York State engagements the effects are bound to be felt in their substantial interstate business. Once a leader's name is placed on what would amount to a blacklist I seriously doubt that it would make much difference whether or not the Local made it clear to the membership that the leader was to be boycotted only as to New York State engagements. The blacklisted leader would most likely be shunned on the 'Exchange Floor' by most of the membership. Some members might be hostile because of the leader's opposition to the welfare plan and others might be afraid to be seen negotiating on the 'Floor' with a blacklisted leader. I find, therefore, that there is a sufficient likelihood that the dispute will affect interstate commerce for the Labor Management Relations Act, section 302, to apply." (183 F.Supp. 639–640)

Judge Dimock was affirmed on appeal, 2 Cir., 1960, 284 F.2d 91.

2. On appeal from Judge Palmieri's order denying a temporary injunction against collection from plaintiffs of the 1½% tax and the 10% Traveling Surcharge, the Court of Appeals reversed in part, 2 Cir.1961, 295 F.2d 484. Judge Friendly wrote:

"* * * The Local's by-law imposing the 'tax' and the provision of the International's Constitution imposing the 'traveling surcharge' are not limited to engagements within the state; indeed, the latter applies only to engagements outside the Lo-

cal's own jurisdiction, many, if not most, of which would be outside the state of New York. The case with respect to interstate commerce is thus immeasurably stronger than that before Judge Dimock; and if we were preliminarily satisfied of an effect on commerce there, we must surely be so here. We hold that defendants have thus far failed to raise any substantial issue that these two impositions did not relate to 'an industry affecting commerce,' United States v. Shubert, 1955, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279."

The jurisdictional facts established at trial concerning the single engagement industry and the businesses of plaintiffs Carroll and Peterson are sufficient to bring this case within the general principles enunciated in United States v. Shubert, 1955, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279. See also United States v. South-Eastern Underwriters Association, 1944, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440; United States v. International Boxing Club, 1955, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290; Radovich v. National Football League, 1957, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456.

Title 29 U.S.C.A. § 402(c) defines "industry affecting commerce" as "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor Management Relations Act, 1947, as amended, or the Railway Labor Act, as amended." The Labor Management Relations Act of 1947, 29 U.S.C.A. § 142(1) defines the phrase as "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce, or * * * the free flow of commerce." The term "commerce" is defined in 29 U.S.C.A. § 152(6) as "trade, traffic, commerce, transportation, or communication among the several States * * *." The amount of interstate business done by employer is not controlling with re-

gard to the power of Congress to regulate such business and Congress has the power to regulate even intrastate business where such business tends to burden or affect interstate commerce. National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Consolidated Edison Co. v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Polish Nat. Alliance v. National Labor Relations Board, 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509.

The single engagement industry is "an industry affecting commerce" (see Findings of Fact Nos. 12 and 13) and the fact that the rendering of a musical performance is a "local affair" is not determinative. Plaintiffs Carroll and Peterson in connection with their respective businesses customarily do many more things in addition to the actual leading of their orchestras, such as the negotiating and signing of engagement contracts and the transporting of sidemen, musical instruments and other required materials between states of the United States (see Finding of Fact No. 18). As Mr. Justice Warren stated in United States v. International Boxing Club, supra, 348 U.S. at 241, 75 S.Ct. at 261, decided the same day as the Shubert case, supra:

"A boxing match—like the showing of a motion picture (United States v. Crescent Amusement Co., 323 U.S. 173, 183 [65 S.Ct. 254, 89 L.Ed. 160]) or the performance of a vaudeville act (Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271 [43 S.Ct. 540, 67 L.Ed. 977]) or the performance of a legitimate stage attraction (United States v. Shubert, [348 U.S.] ante, p. 222 [75 S.Ct. 277])—'is of course a local affair.' But that fact alone does not bar application of the Sherman Act to a business based on the promotion of such matches, if the business is itself engaged in interstate commerce or the business imposes illegal restraints on interstate commerce."

## III.

Section 302 of the Labor Management Relations Act, 29 U.S.C.A. § 186, provides:

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

\* \* \* \* \* \*

"(c) The provisions of this section shall not be applicable \* \* \* (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment \* \* \* or (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, That \* \* \* (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon \* \* \*."

It is conceded that no written authorizations were ever executed by employees with respect to the 1½% Local Tax and the 10% Traveling Surcharge (see statement of defendants' counsel, record p. 760). It is also undisputed that the Welfare Fund does not comply with the requirements of Section 186(c) because, among other things, no written agree-

ment with employers was executed and only officers of defendant Local 802 are to serve on the Board of Trustees of the Fund (see statement of defendants' counsel, record p. 582).

Defendants, however, deny that plaintiff orchestra leaders Carroll and Peterson are employers within the meaning of Section 186 and, consequently, assert that the statute is inapplicable to the payments involved herein. Judge Friendly answered the defendants in the following terms:

"Although defendants deny that the orchestra leader is the 'employer' of the sidemen and claim the father of the bride is the true employer, as indeed the contract form says, we think this contention, far from being serious or difficult, borders on the frivolous for reasons stated in another connection by the Court of Claims in Cutler v. United States, 1960, 180 F.Supp. 360, 362,—an opinion followed by Judge Dimock in his decision in Carroll v. Associated Musicians of Greater New York, supra, which we affirmed. * * *" 295 F.2d, supra at 486.

The contention of plaintiffs Carroll and Peterson that they are employers of their sidemen is clearly supported by the evidence (see Findings of Fact Nos. 16–21).

Consequently, Section 186 applies to these payments and since they do not comply with the exceptions contained in Section 186(c), they are unlawful. Accordingly, I turn to the question of the equitable relief to be accorded plaintiffs Carroll and Peterson.

## IV.

The plaintiffs Carroll and Peterson apparently do not seek to be restored to membership in defendant unions. They do, however, seek protection from any reprisals or other interferences with their business based on their refusal to collect, transmit or pay over to defendants the Local Tax, Traveling Surcharge and Welfare Fund payments. In short, they seek protection of their right to refrain from engaging in the collection, payment or transmission of union exactions which are unlawful.

There is absolutely no evidence to support a finding that non-members are obliged to make any of the payments attacked as unlawful herein. In fact, the evidence establishes the contrary—that if such payments were tendered by non-members, they would be refused by defendants.

Plaintiffs argue that even if they were not subject to the By-Laws of defendant unions because they are no longer members, they are, nevertheless, entitled to injunctive relief because they have been subject to or are threatened with reprisals and economic sanctions. Plaintiffs support their position by reliance on the respective Constitutions and By-Laws of defendant unions regarding (1) intra-union practices as to members who fail to comply with union rules, and (2) union rules governing members' working relationships with non-members. There is no evidence that defendant unions ever required a non-union member orchestra leader to pay the Local Tax or the Traveling Surcharge or that any economic reprisals of any kind were ever imposed upon them for failure to pay the Local Tax or Traveling Surcharge. Plaintiff Peterson in testifying as to his expulsion from defendant unions in March, 1961 (Peterson, 347–348) did not testify that he was subject to reprisals or economic pressures because of his failure to pay the Local Tax or Traveling Surcharge.

After trial of these cases, plaintiffs, upon request of the court, submitted a thirty-five page memorandum (Further Supplemental Memorandum) purporting to set forth instances of "actual and threatened reprisals against orchestra leaders by defendants" contained in the trial record. Careful study of this memorandum and all the other evidence in this case fails to disclose a single instance in which a non-union orchestra leader was subject to reprisals or economic pressure of any kind by reason of

non-payment of the Local Tax or the Traveling Surcharge.

Plaintiffs in their Further Supplemental Memorandum point to, among other things, the following to establish their case:

(1) The deposition before trial of Alfred Manuti, President of defendant Local 802, taken on February 1, 1962 (Pl. Ex. 56), which contains the following:

"Q. Isn't it true, Mr. Manuti, that your union does insist that orchestra leaders become and remain members in good standing if they are to have members of your union play for them as sidemen?

"A. Yes, sir. [p. 114]

"Q. Is it true that no member of the American Federation of Musicians or of your local or any local is permitted to play with a suspended or expelled member or non-member unless the Federation itself gives consent?

"A. That's true.

"Q. Does the Federation according to your experience, regularly give that consent?

"A. I am not aware of that, no.

"Q. And isn't it true that no orchestra leader and no orchestra comprising members of your local, for example, is permitted to render services with non-members without the permission of the executive board of your local?

"A. That's true.

"Q. Does your local executive board regularly give such consent?

"A. The only time we may consent to our sidemen performing with a non-member is if some outstanding conductor comes from Europe, who is here on a visa and who is going to do a couple of concerts. * * *" [p. 123]

"Q. Isn't it true that no person is ordinarily permitted by your union to use any kind of a musical instrument or device in an orchestra or for an orchestra leader unless he

holds a membership card with your union or one of the affiliated unions?

* * * * * *

"A. Musical instruments, yes, he would not be able to. [p. 124]

"Q. Your local regards it as a violation of your local rules and as detrimental to the welfare of your union for a member, whether he is an orchestra leader or a sideman, to perform with a band or an orchestra which is advertised under the name of a non-member; isn't that right?

"A. That's right. [p. 125]

"Q. * * * Is it true that no engagement of an orchestra leader is regarded as effective unless it is first approved by your board?

"A. According to our by-laws, yes, that's true. [p. 127].

"Q. If in a particular case you find that the man is not recognized by you as an orchestra leader, what happens?

"A. Well, in that case I am sure that the department would check it out or check him further and find out whether or not he is a member.

"Q. And if he were not a member, what procedure, if any, would your union follow?

"A. We wouldn't accept his contract.

"Q. Suppose he attempted to play the engagement anyway? [p. 128]

"A. Well you should have to play without musicians and sidemen, because our sidemen wouldn't be able to perform with them. Our business agent would be on the job.

"Q. In other words, your business agent would advise the sidemen in some way?

"A. That's right, that he is not in good standing and they cannot perform with him and subject themselves to charges. [p. 129]"

(2) The deposition before trial of Max L. Arons, Secretary of Local 802, taken

on January 16, 1962 (Pl. Ex. 53), which contains the following:

"Q. Now, if an orchestra leader fails to pay the local tax he can be brought up on charges for that, can't he?

"A. He can.

"Q. And as a matter of fact, under the by-laws of the local, he's subject ultimately to expulsion, if he didn't pay, is that correct?

"A. That's correct. [p. 34]"

Plaintiffs appear preoccupied with the fact that defendants regulate the professional conduct of their members and impose penalties upon them for failure to comply with such regulations. This is not the issue here. Plaintiffs have the burden of establishing that they, Carroll and Peterson, are subject to actual or threatened reprisals against them for failure to make the payments involved herein—this they have failed to do.

 Injunctive relief is not a matter of right but its grant or refusal rests in the sound discretion of the court. Harrisonville v. W. S. Dickey Clay. Mfg. Co., 1933, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; Alabama v. United States, 1929, 279 U.S. 229, 49 S.Ct. 266, 73 L.Ed. 675; Rice & Adams Corp. v. Lathrop, 1929, 278 U.S. 509, 49 S.Ct. 220, 73 L.Ed. 480. "As a general rule, an injunction should issue only in cases specifically pointed out by law, or where irreparable injury to the personal or property rights of the individual will result unless protected by its restraining effect." 43 C.J.S. Injunctions § 16 and cases cited therein. The complainant must establish not only the existence of his right but must affirmatively show that the acts sought to be restrained will be a violation of such right. Greeson v. Imperial Irrigation Dist., D.C.S.D.Cal. 1931, 55 F.2d 321, aff'd, 9 Cir.1932, 59 F.2d 529; Coty v. Prestonettes, Inc., 2 Cir.1922, 285 F. 501, rev'd on other grounds, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731.

 The possibility of refusal of Local 802 sidemen to work for individual plaintiffs in the future, if such refusals actually take place, has not been proved to result from plaintiffs' failure to make the aforesaid payments. Such refusal, should it occur, may very well be a manifestation of the fundamental right of union members to act in concert to protect their mutual interests and to refuse to perform services with non-members. See Hunt v. Crumboch, 1945, 325 U.S. 821, 824, 65 S.Ct. 1545, 89 L.Ed. 1954; Senn v. Tile Layers Protective Union, 1937, 301 U.S. 468, 480–482, 57 S.Ct. 857, 81 L.Ed. 1229. If irreparable injury is threatened and impending to rights of complainant, an injunction usually will be granted. Swift & Co. v. United States, 1928, 276 U.S. 311, 48 S. Ct. 311, 72 L.Ed. 587. It is not necessary to wait for the actual occurrence of an injury which it is shown may be reasonably expected. Pennsylvania v. West Virginia, 1923, 262 U.S. 553, 592–593, 43 S.Ct. 658, 67 L.Ed. 1117. However, an injunction will not issue in the absence of an actual or presently threatened interference. State of Connecticut v. Commonwealth of Massachusetts, 1931, 283 U.S. 789, 51 S.Ct. 356, 75 L.Ed. 1416; see 43 C.J.S. Injunctions § 21 and cases. It is not a sufficient ground for the issuance of an injunction that injurious acts may *possibly* be committed or that injury may *possibly* result from acts sought to be prevented; there must be at least a reasonable probability that the injury will be done if no injunction is granted. Injunctions will not be granted merely to allay fears and apprehensions of individuals. Graves v. Mount Vernon Trust Co., 2 Cir.1934, 69 F.2d 101; Walling v. T. Buettner & Co., 7 Cir. 1943, 133 F.2d 306; Kelley v. Kavanaugh, D.C.W.D.N.Y.1933, 3 F.Supp. 666; Baumann v. Baumann, 1929, 250 N.Y. 382, 165 N.E. 819.

Since plaintiffs Carroll and Peterson do not seek reinstatement to union membership, no evidence has been introduced as to the specific union rules and regulations which they refused to adhere to and which caused their expulsion. However, if expulsion was prompted by a

refusal to make unlawful payments, this might constitute a penalty or reprisal which, upon proper proof, could be enjoined. Such holding is unnecessary here since reinstatement is neither sought nor apparently desired by these plaintiffs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of these actions.

2. The plaintiffs Orchestra Leaders of Greater New York and Charles Turecamo, as Treasurer of said association, have failed to establish that they have any interest in these actions; that they have standing to sue; that they have in any way been damaged or aggrieved by any conduct of defendants or that they are threatened with any injury in the future. Accordingly, the complaints as to these plaintiffs must be dismissed.

3. The complaints, insofar as they purport to assert class actions, must be dismissed since there is a lack of credible evidence to establish that such class (as defined in the complaint) exists, and even if found to exist, there is no evidence to establish that its members are "so numerous as to make it impracticable to bring them before the court" or that plaintiffs fairly insure adequate representation of such class. Nevertheless, the actions will be treated as having been instituted by plaintiffs Carroll and Peterson in their individual capacities.

4. There is no evidence that plaintiffs Carroll and Peterson, in their present status as non-members of defendant unions, are obligated or compelled, either at present or in the future, to collect, pay or transmit the Local Tax, Traveling Surcharge and Welfare Fund payments to defendants.

There is no evidence that any reprisals or economic sanctions have been imposed upon plaintiffs Carroll and Peterson in their present status as non-members of defendant unions, by defendants as a result of their refusal and failure to collect, pay or transmit the aforesaid payments to defendants.

There is no evidence that plaintiffs Carroll and Peterson are threatened with any reprisals or economic sanctions in the future by defendants as a result of said plaintiffs' refusal and failure to collect, pay or transmit the aforesaid payments to defendants or as a result of the institution of these actions or proceedings before the National Labor Relations Board.

Accordingly, the complaints in these actions, 60 Civil 1169 and 60 Civil 4025, must be dismissed for failure of proof.

This opinion contains the Findings of Fact and Conclusions of Law required by Rule 52 of the Federal Rules of Civil Procedure.

Submit final judgment upon notice in accordance with the opinion herein.