Cowen, Chief Judge,
delivered the opinion of the court:
Plaintiff, Arthur Venneri Company (hereinafter generally referred to as Venneri) sues for refund of income tax withholdings, Federal insurance contribution taxes (FICA) and Federal unemployment compensation taxes (FUTA) paid for the tax year 1954 and for a portion of the tax year 1955. The taxes were assessed on the wages received by employees of the George B. Landers Construction Co., Inc. (hereinafter referred to as Landers), a subcontractor of Venneri.
In 1954, Venneri, a New Jersey corporation, was engaged in construction work under five contracts with the Army Corps of Engineers at an air base in New Hampshire. As Venneri’s subcontractor, Landers agreed to furnish all the labor, material, and equipment required to perform the excavation and related work called for under Venneri’s five general contracts. The subcontracts also specified that Landers would bear the liability “for any contributions for unemployment, social security, or other insurance covering the [Lan-ders] employees . . .”
Shortly after Landers began work under the subcontracts, it became apparent that Landers was in financial difficulty and would be unable to meet its payroll and other obligations as they arose. In order to enable Landers to perform its subcontracts, Venneri and Landers made a financing arrangement to provide Landers with advance payments of the sums which would become due under its several subcontracts. In a special bank account which was opened for this purpose, Venneri deposited funds which were to be used by Landers to pay only those obligations arising directly under the sub *77 contracts. Venneri did not make any wage payments to Landers’ employees, and Landers continued as before to prepare its payroll and disburse the wages due. Checks signed by a Venneri representative were drawn upon the special account for payroll and other expenses incurred by Landers in performing the contracts. The payroll checks were issued in the net amounts due after deducting all Federal and State taxes. Landers did not make payment to the'Government for such taxes withheld or deducted.
In connection with the financing arrangement, Venneri and Landers executed rider agreements which became a part of the subcontracts. The riders, a typical copy of which is set out in the findings of fact, provided in substance that Venneri would advance money to Landers prior to the dates that Venneri was obligated to pay Landers under the subcontracts and that Landers would share any profits earned on the subcontracts equally with Venneri; Landers also agreed to perform certain additional work without extra charge. Except for these conditions, the subcontracts remained unchanged.
On February 9,1955, Venneri terminated the subcontracts because of Landers’ alleged failure to comply with specified terms and conditions of the subcontracts.
On or about May 2 1956, the District Director for the Internal Revenue District of New Hampshire made a levy in the amount of $14,962.25 against Venneri and Landers for alleged nonpayment of income and FICA taxes withheld for the last two quarters of 1954 and the first quarter of 1955 and nonpayment of FUTA taxes withheld for the year 1954. On May 9, 1956, Venneri paid the full amount of the levy, and thereafter filed timely claims for refund. Upon denial of the claims, the present suit followed.
The sole issue for our determination is whether Venneri was the employer, as that term is defined in.the taxing statutes, of Landers’ employees during the period in question.
Whether one is the employer of another for purposes of the FIGA and FUTA taxes depends on the degree of control exercised over or the right to control the activities of the alleged employees. Edwards v. United States, 144 Ct. *78 Cl. 158, 168 F. Supp. 955 (1958). We have held that the determination of the existence of such a relationship is to be made only after a realistic consideration of all the factors involved. Ben Cutler v. United States, 148 Ct. Cl. 537, 180 F. Supp. 360 (1960). Defendant argues that the “explicit terms of the contracts and rider agreements” are “clear and convincing evidence that the taxpayer, both before and after the execution of the riders, had the right to control the daily operations of Landers Company’s personnel.” The defendant has pointed to certain provisions of the subcontracts, which when viewed apart from the basic purposes for which the agreements were made and the circumstances under which they were executed, lend apparent support to defendant’s position.
The terms of the subcontracts are set forth in our findings of fact and will not be repeated in detail here. Landers was required to furnish all the labor and equipment for the work covered in the subcontracts in consideration of the payment of a fixed fee. Venneri had no right to hire or fire any of the subcontractors’ employees. Although Ven-neri had the right to direct Landers as to the number of men it would employ on the job, it is clear that this provision was inserted to assure Venneri that the work would be completed within the time required by the prime contract rather than to grant Venneri control over the details of how the work would be performed. In Article VII of each subcontract, provision was made for Venneri’s superintendent to give orders directly to Landers’ foremen and employees, but the other terms of this article show that the contractor’s right to give such directions was for the purpose of facilitating the orderly prosecution of the contract work, to avoid delay and interference to other trades on the job, and to make certain that the subcontracts would be completed within the time fixed by the general contract. All of the subcontracts were on standard forms that Venneri used in its various construction projects. The provisions of the subcontracts are similar to those which are often found in subcontracts executed in connection with Government construction projects and are included to insure the prime con *79 tractor that the work will be accomplished within the time and in accordance with the requirements of the general con-f tract. The authorities cited by defendant do not support its contention in such a contractor-subcontractor relationship. Subcontractors, like physicians, lawyers, and contractors, are generally regarded as independent contractors and not as employees.[1]
However, defendant places special emphasis on the rider agreements by which, as Commissioner Arens found, “Ven-neri, through its assistant project manager, and/or a supervisor, exercised closer supervision over Landers’ work.” The commissioner characterized such supervision as including “ordering Landers regarding the work to be done, where it was to be done, and how many men Landers was to use on certain jobs.” He noted that “George B. Landers continued at the jobsite, however, in the capacity of supervisor for Landers.” In view of the financial difficulties encountered by Landers and the advance of funds by Venneri, it was to be expected that the latter would exercise a greater degree of control over the work than before. However, in our opinion, the evidence as a whole shows that the additional supervision on the part of Venneri was directed toward the results to be accomplished rather than toward the means and methods for accomplishing the result. Consequently, the rider agreements did not change the relationship between Venneri and Landers so as to make Venneri liable for the payment of the taxes involved here. Bartels v. Birmingham, 332 U.S. 126 (1947) and Ben Outler v. United States, supra, each involved operators of nightclubs and organizers of social events, who contracted with bandleaders for bands to play at these functions. Tire contracts expressly provided that the operators were to have complete control at all times of the services to be performed under the contracts. In Ben Outler, the operators specified the services to be performed, the locations where the work was to be done, and the number of men the bandleader was to use on particular programs, plus the type of music to be used and its tempo, as well as *80 the physical location of the musicians. In each case, it was held that the bandleader was an independent contractor and that he, rather than the operator, was the employer of the musicians. As stated in Ben Cutler v. United States, supra, “this type of control pertains to the service to be rendered and does not give control over the method of rendering it.” See also United States v. Silk, 331 U.S. 704 (1947). We think the rationale of these cases applies here for the purpose of determining Venneri’s liability for the payment of the FICA and FUTA taxes. With respect to such taxes, therefore, we hold that Landers was an independent contractor and a fortiori, its employees were not the employees of Venneri.
In determining who is an employer for the purposes of the withholding tax, a different criterion is used. In a series of decisions by the Ninth and Fifth Circuits, it has been held that the employer is one who has exclusive control of the payment of the wages. Westover v. William Simpson Construction Co., 209 F. 2d (9th Cir. 1954); Firemen's Fund Indemnity Co. v. United States, 210 F. 2d 472 (9th Cir. 1954); Century Indemnity Co. v. Riddell, 317 F. 2d 681 (9th Cir. 1963) and Phinney v. The Southern Warehouse Corp., 212 F. 2d 488 (5th Cir. 1954). These decisions rest upon the provisions of 26 U.S.C. (I.R.C. 1939) § 1621(d) (1952 Ed.).[2]
In the rider agreements here in issue, it was Landers rather than Venneri who made up the payrolls, determined who was to be paid wages, and designated the amount to be paid in each instance. The fact that Venneri supplied the funds for the payroll is not sufficient to make it the employer. Westover v. William Simpson Construction Co., supra, at 911. Furthermore, the restriction of the funds advanced by Ven-neri to the payment of wages and expenses arising out of the subcontracts did not give Venneri sole control of the payment of the wages, for, as the court found in Phinney v. *81 Southern Warehouse Corp., supra, at 490, “The advances were made in the manner stated to insure that they would be applied to the payment of material and labor bills and not be diverted. . .
Venneri had no voice in the matter of who would be employed by Landers or at what wage. Venneri hired no one for Landers nor did Venneri fire any of Landers’ employees.
Since it is altogether clear that Venneri did not have sole control over the payment of the wages, Venneri was not an employer within the meaning of section 1621(d).
As its second defense, defendant argues that since Venneri was to share in the profits on the subcontracts, Venneri was a joint venturer with Landers and therefore a co-employer of Landers’ employees. Thus, since Landers cannot pay the taxes, defendant asserts that Venneri should pay them.
In its brief, defendant has set forth several criteria for a determination of the existence of a partnership or joint venture for the purposes of Federal taxation, as outlined in Barrett and Seago Partners and Partnerships, Law and Taxation, section 10, page 98. A discussion of these criteria, to the extent that they are pertinent here, will demonstrate that a joint venture did not, in fact, exist in this instance.
1. The partners must either contribute services or ha/oe capital invested in the business in the taxable pear in question. The money deposited by Venneri in the bank account pursuant to the rider agreements was not a contribution of capital but an advance of funds which would be due Landers as it completed its work. Upon the termination of the subcontracts, Venneri had the right to recoup funds which it had advanced but which Landers had not, in fact, earned. Thus, the relationship between them was that of creditor and debtor. There was no capital investment by Venneri.
2. Sharing of the profits amongst all the partners. The provision for Venneri to share in the profits here was made manifestly as a consideration for its advance of funds to be earned by Landers under the subcontracts. It was not the sharing of profits that is normally contemplated when two persons contribute their property, money, efforts, skill and knowledge in some common undertaking. An almost identical situation was before the court in Myers v. St. Louis *82 Structural Steel Co., 65 S. W. 2d, 931 (1933). In that case, it appears that after the subcontractor found himself in financial difficulties,'he and the general contractor entered into a new agreement, which provided: (1) the general contractor was to advance funds to the subcontractor; (2) the general contractor was to participate in the subcontractor’s profits to a stated extent when and as profits were earned, and (3) the general contractor was to exercise supervision over the amounts advanced by him. In holding that no joint venture existed, the court stated that the purpose of the arrangement , was not to make a profit but to keep the subcontractor on the job, and that the provisions .regarding the supervision of the funds advanced were of the type that are commonly made pending repayment of funds lent in the progress of construction work.
3. Sharing of losses and personal liability for such losses that may be sustained by the business. Surely the defendant would not suggest that Venneri is indebted to Landers’ general creditors for debts resulting from the loss sustained by Landers on the terminated subcontracts. • There is, of course, no .provision in the rider agreements for the sharing by Ven-neri of any losses whatsoever. Thus, the “community of interests in profits and losses,” which the Supreme Court in Commissioner v. Tower, 327 U.S. 280 (1946) designated, as the.distinguishing feature of a joint venture in Federal tax cases, is absent in this case. The existence of a creditor-debtor relationship between Venneri and Landers negates the existence of a joint venture in which both partners are to share in the losses.
4. Oommon management and control of the business by the partners. In its contention with respect to the FICA and FUTA taxes, defendant would have Venneri in sole control of Landers and all of its employees but, in arguing that a joint venture was formed, defendant is forced to redistribute that control jointly. For the reasons previously set forth above, we find that the element of equal right of control is also lacking here. Both in the subcontracts and in the riders, Landers reserved the right to hire and fire all of its employees.; There is no evidence that any person was ever employed by Venneri for work on the Landers subcontracts. *83 The equipment and facilities needed for the performance of the subcontracts were owned or rented- by Landers. There was no joint ownership of the instrumentalities and subject matter of the enterprise. Venneri paid Landers for the use of office space in a building owned by Landers. When Ven-neri’s employees, using Venneri equipment, performed any part of the work called for under the Landers’ subcontracts, Venneri charged Landers for the full amount of the expense, including labor, materials, and overhead.
In Barrett and Seago’s text, there are discussions of other factors to be considered in determining the existence of a joint venture. We need not refer to any other factors, however, because we are convinced that the facts of this case do not establish the presence of the two elements which are essential to constitute a joint venture — sharing of the losses and joint control of the property of the venturé. Backus Plywood Corp. v. Commercial Decal, Inc., 208 F. Supp. 687 (S.D.N.Y. 1962); aff’d as modified, 317 F. 2d 339 (2d Cir. 1963), cert. denied, 375 U.S. 879 (1963).
In summary, we hold that Landers maintained its status as an independent contractor and that Venneri was not the employer of Landers’ personnel for Federal tax purposes during the period in suit. We arrive at this conclusion after a consideration of the applicable statutes, the language of th% subcontracts and riders, the circumstances under and the purposes for which these agreements were executed,' and the actions of Venneri and Landers in carrying out such agreements. As the Supreme Court said in Bartels v. Birmingham, supra, “it is the total situation that controls.”
Judgment will be entered for plaintiff on the first claim alleged in its petition; the amount of recovery is to be determined pursuant to Bule 47 (c).' The petition is dismissed as to the second and third claims thereof.
PINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Arthur Venneri Company (hereinafter generally referred to as “Venneri”), is a corporation organized *84 under the laws of the State of New Jersey, with its principal place of business in Westfield, New Jersey.
2. Prior to May 21, 1954, Venneri entered into five contracts with the United States Army Corps of Engineers with respect to certain construction work which was to be performed by Venneri at an air base in Portsmouth, New Hampshire. These contracts bore the following designations: DA~19-016-eng-2998; DA-19-016-eng-3028; DA-19-016eng-3033; DA-19-016-eng-3099, and DA-19-016-eng-3100.
3. On May 21,1954, Venneri entered into five subcontracts with George B. Landers Construction Co., Inc. (hereinafter generally referred to as “Landers”), a corporation organized and existing under the laws of the State of New Hampshire. Each of the subcontracts related to one of the general contracts (referred to in finding 2, supra) between Venneri and the United States Army Corps of Engineers.
4. (a) Each of the subcontracts provided in substance that Landers would furnish all labor, material, and equipment to perform the necessary excavation and other related work with respect to the structures referrred to in the applicable general contract between Venneri and the United States Army Corps of Engineers. The terms of each of the subcontracts were identical, except for (1) the description of the applicable general contract, (2) minor differences in the description of the work to be done by Landers, and (3) the amount of money to be paid by Venneri.
(b) All of the subcontracts appear on subcontract forms used by Venneri in its various construction projects.
(c) The contract price on each subcontract was fixed and inclusive. Attachments to each subcontract set forth the amount to be paid by Venneri to Landers with respect to each of the buildings or structures covered by the relevant general contract between Venneri and the United States Army Corps of Engineers for which excavation work was to be performed by Landers.
5. Pertinent provisions of a representative subcontract between Venneri (the first party) and Landers (the second party) are:
Article III. The second party shall under the direction of the first party, and to the satisfaction of the *85 architect, the owner of said premises, and the first party, perform the following: Furnish all labor, material, and equipment to perform the following work on the above project:
1. All building excavation including hand and machine.
2. All building backfill
3. All compacting of fill
4. All necessary borrow and fill
5. All gravel under slabs and roads
6. All bituminous paving including shoulders
7. All sidewalks if required
8. All outside utilities including sewer, water, storm drains, underdrains, and manholes.
9. All topsoil and seeding
10. Grubbing of all areas
11. Stripping of topsoil
12. Pumping of all excavations
13. All’rough grading
14. Cutting of all ditches as required by the drawings and specifications.
All work to be in accordance with the plans and specifications as prepared by the Corps of Engineers and the architect. ■
* $ *
* * * All such labor and material shall be the best of their respective kinds and the second party shall provide at his own expense, all tools, scaffolding, implements, water, heat, light, power, electric service, cartage, storage space, shop drawings, tests, molds, photographs, models, guarantees, samples and permits necessary for the due and proper performance.of this'contract and pay all inspection fees, royalties and license fees and save the first party harmless from loss or annoyance on account of claims or suits of any kind for infringement of patents in connection with the work. * * * Should the first party supply any thing or facility used by the second party which the second party has agreed to supply for his own use then the second party shall reimburse the first party therefor or where the second party and others have obtained the use or benefit of such thing or facility then the second party shall bear such proportion of the cost thereof as the amount of this subcontract bears to the total value of the contract or work done by all enjoying the use of such thing or facility.
$ $ $ $ $
Article V. * * * And the first party shall have the right, in event of termination of the general contract *86 for any cause, at any time, to cancel this contract and require the second party to cease work thereon in which case the first party shall indemnify the second party based on the contract amount against any damage directly resulting from cancellation except that the second party shall not be entitled to compensation for prospective profits or material unfurnished and except that in the event the general contract is terminated by any action or by any default of the owner, or in- event the work is stopped by Court Order or public authority, the first party shall be liable only for the amount actually received by it for the work performed by the second party less its proportionate share of said sum. In case the amount to be added or deducted from the contract price is not agreed to, the valuation of work added or omitted shall be referred to three arbitrators to be appointed one by each of the parties and the third by the two so chosen, but the first party in event of additional work, shall not be liable for a greater sum than it obtains from the owner for such additional work, less a reasonable overhead and profit to the first party, and the recovery for such extra work shall be conditioned upon receipt of payment therefor from the owner. In the event of controversy as to the value of work added or omitted, the First Party may inspect the books, contracts and records of the Second Party, who shall make same available for such inspection upon demand. The failure or refusal of Second Party to permit such inspection shall preclude any recovery by Second Party. In event of a deduction, the deduction taken by the owner shall be controlling. First party shall not be liable for any damages resulting from any default, breach or interference by the owner.
# * * * *
Article VI. The second party shall provide both in the shops and at the building, sufficient, safe and proper facilities at all times for the inspection of the work by the architect or the first party and must upon request of the first party produce all vouchers showing the quality of the material used and must upon request take all steps necessary to procure the approval of materials and must deliver samples thereof and subject such materials to tests whenever required. The second party shall, within twenty-four hours after receiving written notice from the first party to that effect, proceed to and remove from the grounds or building all materials condemned by the architect or the first party, whether worked or unworked, or take down all portions of the work which *87 the architect or the first party shall condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications, or to the conditions of this contract. The second party shall coyer, protect and exercise due diligence to secure the work from injury, and all damage happening to the same before final acceptance shall be made good by the second party. The second party will do all necessary cutting, fitting, repairing and patching of the work included herein, for and after all other contractors and mechanics, and maintain said work as by said general contract required without expense to the first party and will remove from said premises and site all dirt and rubbish which may result from the work done hereunder from time to time as the work progresses and in event of controversy as to whether the rubbish is that of the second party or any other subcontractor or person or party on the site the determination of the first party as to the liability for the removal of said rubbish shall be final.
Article YU. The second party shall and will proceed with the said work, and every part and detail thereof, in a prompt and diligent manner, and to facilitate the performance thereof, the foreman and employees of the second party shall take orders directly from the Superintendent or the first party and the second party shall and will do the several parts of the work at such times and in such order as the first party may from time to time direct, and in the event the project is divided into sections the second party shall prosecute, if required by the first party, all sections simultaneously, and shall and will proceed with and wholly finish tne said work according to the said drawings and specifications, and this contract, in such time as not to delay the other trades and to insure completion of the general contract within the time fixed herein, the general contract time being of the essence of this contract. Second party shall work overtime, Saturdays and Sundays at the direction of the first party without additional cost to the first party if in the judgment of the first party such overtime and Saturday and Sunday work is necessary due to delays of second party, or in event Government regulations require such overtime work.
íjí ^ •!»
Article VIII. The second party shall not cause any unnecessary hindrance or delay to other contractors on said building, and shall bear all damages done to the work of such other contractors by him or his employees, and will repair all damage to adjoining streets, side *88 walks, and premises done by him or his employees, and shall be directly responsible to any other contractor or subcontractor whose work is so damaged, and in the event the work of the second party is damaged by any other subcontractor or contractor on the site, such other contractor and subcontractor shall be directly responsible to the second party and the second party will not seek compensation or damages from the first party by reason thereof.
Should the second party be obstructed or delayed in the commencement, prosecution, or completion of the work because of conditions not attributable to the second party, and which by the terms of the general contract may be ground for an extension of time, he shall within twenty-four hours thereafter make claim therefor in writing, and the first party shall award and certify the amount of additional time to be allowed, if any; said time to be the same as shall be allowed by said owner to the said first party under the general contract aforesaid, for said delay. The first party shall have the right, at any time, to delay or suspend the commencement or execution of the whole or any part of the work herein contracted to be done, or vary the sequence of performance thereof, without compensation to the second party other than extending the time for completing the whole work for a period equal to that of such delay or suspension. Progress Schedules may from time to time be modified to conform to such delays, suspensions or variances and Second Party shall conform its progress thereto.
Article IX. * * *
It is understood and agreed that the functions and powers of the employees of the first party are strictly limited to the execution of the work hereunder, as defined by this contract, and that they have no authority to make, permit or authorize any alteration, change or departure in or from the terms and provisions of this contract or the plans and specifications, or to waive any right of the first party.
*1» •!• V
Article X. The first party will not, in any manner, be answerable or accountable for any loss or damage that shall or may happen to the said work, or any part or parts thereof respectively, or any of the materials or other things used or employed in finishing or completing the said work, or for injury to any person or persons, either workmen or the public, or for damages to adjoining property, from any cause which might have *89 been prevented by the second party or his workmen, or by any one employed by him against all which injuries, claims, suits, actions, costs and damages to persons or property the second party will properly guard, and make good all damage from whatever cause, being hereby made strictly responsible for the same. The first party may retain from any money due or to become due hereunder, sufficient to indemnify it against any such injuries, claims, suits, actions, costs or damages, should any such claim arise.
The second party further agrees to furnish to the first party within ten days after the execution of this contract, a policy of insurance in a company satisfactory to the first party indemnifying it against liability for negligence claims, both public and workmen’s and for contractual liability in amounts not less than $50,000 for one person and $100,000 for one accident, and for property damage in the sum of $25,000. In case of failure to so furnish same it is agreed that the first party may procure such insurance and charge the cost thereof against the contract price herein feed. Each such policy shall require ten days’ notice to the first party prior to the effectiveness of cancellation thereof.
_ Aeticle XI. The first party will not, under any circumstances, be answerable or accountable for any loss suffered by the second party by fire or theft, but the first party shall obtain fire insurance covering the value of the labor and materials installed and the second party shall contribute to the first party such proportion of the premiums charged as its contract price bears to the general contract price. No materials delivered on the premises to form part of the works shall be removed therefrom without the consent of the first party, excepting only such surplus material as may remain after completion of the work.
Artigue XII. The second party shall employ such number of men as the first party may direct and should the second party at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality and quantity, or become insolvent, or unable to pay his obligations as they mature, or in the opinion of the first party, fail in any respect to prosecute the work with sufficient promptness and diligence to insure its completion within the time herein provided, or fail in the performance of any of the agreements on his part herein contained, the first party shall be at liberty, after two days’ written notice to the second party, delivered personally or mailed to *90 or left at bis residence or place of business, to terminate this contract or any part thereof and may use any materials, implements, appliances or tools furnished by or belonging to the second party and then on the premises, in completing the work and first party may take over any subcontracts or purchase orders of second party, which subcontracts and purchase orders second party does hereby assign to first party, effective upon termination or taking over of the work of second party in whole or in part, as herein provided; or said first party may at its option (said option, if exercised, to be expressed in said notice above-mentioned) itself or through a subcontractor furnish any such labor and material or both, in whole or in part, and offset the cost thereof and expenses therefor against any money due or to become due hereunder. Second party shall be liable for any excess cost of completion of work terminated or performed by first party or its subcontractors in whole or in part.
Article XIII. Any provision of the general contract documents, notwithstanding, any taxes imposed or which may hereafter be imposed by Municipalities, State or Federal government upon the value of work or material furnished by the second party shall be paid by the second party, and the second party accepts exclusive liability for any contributions for unemployment, social security, or other insurance covering the employees of the second party, and the addition to this contract price of any tax imposed now or hereafter on labor or materials furnished by the second party is prohibited.
Article XIV. The second party shall not deal directly with the representatives of the owner but shall handle all matters connected with this contract, the work, or the furnishing of the materials, exclusively through the first party, imless otherwise directed in writing by the first party.
Article XV. The second party shall furnish a competent representative who shall be kept constantly on the ground to represent the second party for the purpose of receiving notices, orders and instructions, and who shall when called upon by the first party report the general progress of the work at the building or elsewhere. *****
Article XX. The sum to be paid second party shall be subject to additions or deductions on account of alterations, additions or omissions, as hereinbefore provided. Progress payment for work performed during any calendar month shall be payable within ten days after payment therefor is received by the first party from *91 the owner. The estimate of the architect as to the value of the work performed shall be binding on the second party for the purpose of computing the value of the work performed by him at such ratio to the contract price herein as the value so fixed bears to the price upon which the architect based his computation. * * *
«Jí V s}c
In the event at any time any obligations incurred by the second party in connection with or as the result of the performance of this subcontract are unpaid, whether due or to become due, the first party is authorized to make such payment direct out of any moneys payable to the second party, and the first party may at any time if it so desire, make direct payment to the labor employed by the second party, and the second party for itself and its subcontractors, materialmen and employees, hereby expressly waives the right to file any lien or claim against the premises or money earned by the first party; and further, that if in violation hereof, the second party shall file any such lien or claim, or if at any time there shall be any lien, or other claim for moneys due or to become due for which if established, the first party might be liable, and which would be chargeable to the second party, the first party shall have the right to bond said lien or claim or otherwise discharge the same and to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify it against such lien or other claim with interest together with the expense incident to discharging such lien or claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorneys’ fees and disbursements all of which the second party agrees to pay. Should the first party give the second party notice of any unpaid claim for obligations incurred by second party, the second party shall be estopped from disputing liability for any such claim unless within three days after such notice it indicates to the first party in writing by registered mail that there is some sum different than that demanded owing, or that there are no sums owing. * * *
6. (a) Landers began work shortly after the subcontracts had been executed. It soon became apparent that Landers was in financial difficulty and was unable to meet its payroll and other obligations as they arose. In June 1954 Landers requested Venneri for advances against the amounts *92 which would be due under the subcontracts and Venneri made advances of substantial amounts of money to Landers. About this time various materialmen and truckers who were supplying Landers under the subcontracts notified Venneri that they had not been paid. Venneri became apprehensive that the money being advanced to Landers might be used by Landers to pay creditors of Landers who were in no way connected with the work under the subcontracts, since Landers was then also working on other jobs. It was for this reason that on July 9, 1954, Venneri set up a special bank account in which Venneri deposited funds which were used solely for obligations under the Landers subcontracts. The signature card at the bank listed the account as “Arthur Venneri Co. Sub-Contractor Acct.”, and bore the signatures of both George B. Landers, president of Landers, and of Benedict Torcivia, who was the assistant project manager of Venneri. On the signature card was the notation “Both Signatures [Required.” Landers made no deposits in the special account.
(b) Checks against the special account were prepared by Landers’ bookkeeper who presented them, together with the supporting data (bills or payroll), to Mr. Torcivia who would inspect the checks and supporting data, sign the checks, and return them to Landers’ bookkeeper for distribution. At the trial Mr. Landers testified that he did not recall signing any of the checks and there is no evidence that any representative of Landers co-signed any of the checks.
7. (a) On July 12,1954, three days after the special bank account was set up, rider agreements between Venneri and Landers were executed for each of the subcontracts. Except for the designation of the general contract number, the riders to each subcontract are identical. The body of a representative rider reads:
I, George B. LaNders, President of the Geo. B. LaNd-ers Co., in consideration of the money you have, and will, advance to me prior to the payments as required by the contract terms, do agree:
1. To divide any profits which may result in the performance of this contract equally between the Geo. B. Landers Co. and the Arthur Venneri Company.
2. It is understood and agreed that I shall furnish affidavits and certified evidence for all payments which *93 have and will be done by the Arthur Venneri Company for the payment of labor, material and equipment required in the performance of the existing contract.
8. It is understood and agreed that the Arthur Ven-neri Company through its representatives has absolute control to determine the amount and type of equipment to be used on the job and also the amount and type of personnel to be used for the performance of this contract.
4. It is understood and agreed that the accountants of the Arthur Venneri Company have the right _ to analyze the books of the Geo. B. Landers Co., in relation with the performance of this contract only, and to determine what net profits were actually obtained when all work, or portion of it, is done and accepted by the owners.
5. I do agree that I shall devote all my time as necessary to supervise the performance of this contract and to work in full agreement with the representatives of the Arthur Venneri Company and to follow the required work schedule.
6. It is further agreed that the expenditures which are to be met and financed by the Arthur Venneri Company in behalf of the Geo. B. Landers Co. are only those for personnel, equipment and material directly used at the jobsite.
7. It is further understood and agreed that in view of the above-mentioned considerations, the Geo. B. Land-ers Co. shall perform all engineering layout required for the above-captioned project as a part of this contract with the Arthur Venneri Company. This work shall be performed at no cost to the Arthur Venneri Company.
It is finally agreed and understood that every clause of the contract as now existing shall remain in force in its full entity without any change except as here-above amended. It is also agreed that the Arthur Venneri Company reserves the right to cancel this amendment to the contract anytime they see fit.
(b) One of the purposes for executing the rider agreements was to insure Landers’ employees and contractors on the job that they would be paid.
8.(a) Venneri kept an account of the deposits which it made in the special bank account. The first column of this account, entitled “Cash Beceipts Geo. Landers a/c”, shows the deposits in the special account, starting July 16, 1954. The second column shows progress payments in the total amount of $53,094.30 made directly to Landers, and included *94 progress payments made before the rider agreements, were executed. The advances which were deposited in the special account were charged against Yenneri’s Accounts Receivable account for Landers, as were the progress’payments made prior to the opening of the special account.
(b) Venneri also maintained separate accounts for each Landers subcontract reflecting the original amount of the subcontract and the payments to Landers and the other charges against the subcontract amount. The advances to Landers under the rider agreements, which were deposited in the special account, were recorded on the separate accounts kept by Yenneri for the respective subcontracts. On the individual subcontract accounts kept by Yenneri, all advances which were deposited in the special account were charged against the original contract amount. Advances made to Landers by Yenneri and deposited in the special account were deducted from the subcontract amounts for the respective' subcontracts.
(c) All time cards and payroll records for Landers’ employees were compiled and recorded by Landers’ personnel in the field and in the Landers oflice.
(d) Yenneri kept no records of payroll and withholding taxes for Landers’ employees.
(e) George B. Landers, as president of Landers, signed weekly payroll affidavits in connection with each subcontract and, in so doing, swore under oath that he had paid or supervised payment of the employees. Such affidavits were executed by Mr. Landers both before and after the execution of the rider agreements (finding 7(a), supra,). During the period in issue, Landers did not pay any Federal Insurance Contribution Act or Federal Unemployment Tax Act taxes on the wages earned by its employees.
(f) Checks were issued against the special account for Landers’ employee payroll, materials supplied to Landers, mortgage payments on Landers’ equipment, Federal and State taxes, insurance and workmen’s compensation insurance premiums, and rental payments. The payroll checks were issued in a net amount with all Federal and State taxes having been previously deducted. After the execution of the rider agreements, George B. Landers made requests that *95 certain sums of money be advanced to him personally out of the special account. The requests were honored by Ven-neri and checks in varying amounts were issued payable either to Mr. Landers personally or to Landers and/or a creditor.
9. (a) After the execution of the rider agreements, on July 12, 1954, Landers continued the work covered by the subcontracts and riders until February 9, 1955, at which time Venneri terminated the subcontracts.
(b) During the period in which Landers was performing under the subcontracts, certain portions of the subcontract work were in fact performed by Venneri. When Venneri performed work which Landers was required to do under one of the subcontracts, Venneri issued a Subcontract Change Order which recited the charge by Venneri for the work which it had performed, which charge consisted of labor, equipment rental, and percentage charges for insurance on labor and overhead. Each Change Order recited the original contract amount, the full amount of Venneri’s charge for the work performed by Venneri, and showed the subtraction of this amount from the original subcontract amount. Venneri’s practice was to record these Change Orders at the finish of the job. The Change Order for work performed by Venneri in each instance was charged against the subcontract amount, which charge in effect represented a payment by Landers for work performed by Venneri.
(c) Venneri paid a monthly rental to Landers of $75 for office space in a building owned by Landers near the jobsite.
(d) Trucks, backhoes, and other equipment used by Landers on the job were owned or rented by Landers.
10. There is divergence in the testimony respecting the degree of control exercised by Venneri over Landers before and after the execution of the rider agreements. There is, moreover, sharp difference in the interpretation by plaintiff and defendant of certain of this testimony. From the entire record the following facts are clear:
(a) Before the execution of the rider agreements Ven-neri’s assistant project manager would meet from time to time with Venneri’s project manager and discuss the various phases of the total work as it related to the progress sched *96 ule. The assistant project manager testified that he would then direct each of the seven subcontractors, including Landers, as to the phase of his work which was to be accomplished in order “to integrate and correlate all the work and see that the work was done in an efficient manner.” Under the assistant project manager there were supervisors whose duties were to oversee the subcontract work. The assistant project manager further testified, respecting the situation before the execution of the rider agreements, that he “didn’t go to a' sub and say you must put 150 men here, this type of machine, or that type of machine,” but that he “was merely concerned with time and sequence of operations.” “Prior to the rider agreements,” Mr. Landers testified, “I had control of the employees and the equipment and the work.”
(b) No person was ever employed by Yenneri for the performance of work under the Landers subcontracts, and no employee engaged in the performance of work on the Landers subcontracts was ever fired by Yenneri.
(c) After, the execution of the rider agreements Venneri, through its assistant project manager, and/or a supervisor, exercised closer supervision over Landers’ work. This included ordering Landers regarding the work to be done, where it was to be done, and how many men Landers was to use on certain jobs. George B. Landers continued at the jobsite, however, in the capacity of supervisor for Landers.
11. On February 9, 1955, Yenneri sent to Landers notices of termination of each of the subcontracts. Except for the designation of the general contract number, the notices were identical. A representative notice reads:
To: George B. Landers Construction Co., Inc.
Gosling Boad
Newington, New Hampshire
GENTLEMEN :
You are hereby notified that you have breached the contract entered into between you and the Arthur Yen-neri Company, dated May 21,1954, by which you agreed to furnish all labor, equipment and material for the construction of Officers’ Mess and BOQ,, DA-19-016-Eng-3099, by reason of: ■
*97 (a) Your apparent and admitted insolvency which has rendered you unable to meet and discharge your obligations as they mature;
(b) Your failure to supply a sufficiency of properly skilled workmen and materials of the proper quality and quantity; and
(c) Your failure to prosecute the work with sufficient promptness and diligence to insure its completion within the time provided in the aforementioned contract.
You are further notified that, because of your breach of the aforementioned contract, the Arthur Venneri Company is hereby exercising the option granted it in Paragraph XII of said contract to complete or engage others to complete the remainder of the work to be performed under and according to the terms of said contract. Any costs so incurred in completion of said work will be offset against any moneys due or to become due you under said contract, and you shall be liable for any excess cost of completion of said work incurred by the Arthur Venneri Company by reason of Arthur Venneri Company or its subcontractors completing same.
Dated:
Arthur Venneri Company
By:_
12. (a) On May 2, 1956, a notice of levy in the amount of $14,962.25 was served by the District Director for the Internal Revenue District of New Hampshire on the First National Bank of Portsmouth, New Hampshire, the bank in which plaintiff had deposited the funds for the special account. The notice alleged a tax liability of plaintiff and Landers for Federal withholding and unemployment taxes in respect to the employment of Landers’ employees, plus certain statutory additions. The notice recited that Federal withholding and unemployment taxes were owing for the last two quarters of 1954 and the first quarter of 1955 and that Federal unemployment taxes were owing for the year 1954.
(b) On May 9,1956, plaintiff paid the full amount of the levy, $14,962.25.
13. (a) On April 15,1958, two refund claims aggregating the $14,962.25 payment of May 9, 1956, were filed by plaintiff with the District Director of Internal Revenue in Ports *98 mouth, New Hampshire. One claim was for $14,349.03 representing the income tax withholdings, the Federal insurance tax and withholdings, and the associated statutory additions, which had been paid by plaintiff. The other claim was for $613.22 representing the Federal unemployment taxes and associated statutory additions, which had also been paid by plaintiff.
(b) Each of the above claims filed by plaintiff contained the following as the reasons why the claimant (plaintiff) believed, that the claim should be allowed :
1. Arthur Venneri Company (prime contractor) was not required to withhold or pay-the above taxes. They arose with respect to the wages of employees of George B. Landers Construction Co., Inc., an independent, subcontractor. In July, 1954, some time after George B. Landers Construction Co., Inc. (subcontractor), had started work under its subcontract it was apparent that subcontractor was in financial difficulties. In order that the job would be completed, prime contractor advanced money to subcontractor prior to the payments required by the subcontract. The money thus advanced, passed through a checking account (Arthur Venneri Company, Subcontractor Account) at the First National Bank of Portsmouth, Portsmouth, New Hampshire, which required the signatures of both George B. Landers, an officer of subcontractor, and Benedict Torcivia, an officer of prime contractor. The purpose of this arrangement was to assure that payments would be applied to employees and creditors of subcontractor associated with this subcontract. At all times the subcontract work was done solely under the supervision and control of subcontractor.
2. Arthur Venneri Company is a corporation with its usual place of business in Westfield, New Jersey. Its tax returns are filed with and its taxes are paid to the Newark office of the New Jersey Internal Bevenue District. Inasmuch as the above assessment was made in the New Hampshire Internal Bevenue District, it is null and void.
14. (a) On August 7, 1959, a 30-day letter was sent to plaintiff by the District Director in Portsmouth, New Hampshire, with a report of examination attached, rejecting the claims for refund.
*99 (b) On September 3,, 1959, a protest, pursuant to the 30-day letter, was duly filed by plantiff with the District Director in Portsmouth, New Hampshire.
(c) Under date of August 9,1960, plaintiff received notice from the Appellate Division of the office of the Regional Commissioner of the. Internal Revenue Service that the claims had been disallowed.
15. No claim for refund was ever filed for any of the taxes which were assessed and collected for the 'second quarter of 1954.
16. Plaintiff’s claim in this court is presented on alternate grounds:
(a) That plaintiff was not liable for the taxes alléged to be due in the notice of levy of May 2,1956, because plaintiff was not the employer of Landers’ employees, nor did it have control of the payment of their wages within the meaning of the appropriate provision of the Internal Revenue Code.
(b) That if it is held that plaintiff was liable, the major portion of the liability had been paid before the deficiency assessment and, hence, , there was an overassessment. .
(c) Plaintiff did not present to -the Commissioner of Internal Revenue the grounds alleged in (b), above; nor did plaintiff support its requested findings on (b), above, with citations to the,record as required by Rule. 45(c) (since April 1, 1964, Rule 57(c)).
17. The determination of the amount of recovery, if any, is reserved under Rule 38(c) (since April 1, 1964, Rule 47(c)). . ,
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on the first claim alleged in its petition but is not entitled to recover on the second and third claims alleged in the petition and as to these claims the petition is dismissed. The amount of recovery will be determined pursuant to Rule 47 (c) (2).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due *100 thereunder, it was ordered on May 3, 1965, that judgment for the plaintiff be entered for $14,962.25.

 See Treasury Regulations (1939) Code: 106 §402.204; 107 §403.204; 120 § 406.203.

 Section 1621(d) provides:
“Employer. — The term ‘employer’ means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, except that—
(1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term ‘employer’ (except for the purposes of subsection (a)) means the person having control of the payment of such wages; * * *”
The provisions of Section 3401(d) of the 1954 Code are the same.